**SOCONY MOBIL OIL COMPANY, Inc.**
v.
**UNITED STATES.**

**TEXACO, INC. (Formerly the Texas Company)**
v.
**UNITED STATES.**

**MISSISSIPPI SHIPPING COMPANY, Inc.**
v.
**UNITED STATES.**

Nos. 168–59, 169–59, 49–58, 50–58, 327–58, 328–58, 187–59, 188–59.

United States Court of Claims.

March 1, 1961.

Rehearing Denied May 3, 1961.
See 289 F.2d 326.

Paul Little, New York City, for plaintiff Socony Mobil Oil Co., Inc. John W. Knox, New York City, was on the briefs.

George E. McMurray, Jr., Washington, D. C., for the plaintiff Texaco, Inc. John E. Shea, Washington, D. C., and James F. Birmingham, New York City, were on the briefs.

H. Maurice Fridlund, New York City, for the plaintiff Mississippi Shipping Co., Inc. Joseph M. Rault; Terriberry, Rault, Carroll, Martinez & Yancey, New Orleans, La., Earl Q. Kullman; Montague H. Hackett, Jr.; and Kirlin, Campbell & Keating, New York City, were on the briefs.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for the defendant. James P. Garland and Philip R. Miller, Washington, D. C., were on the briefs.

MADDEN, Judge.

In these three cases the facts have

been stipulated by the parties. All the cases present the same question of law and this opinion will apply to all of them. There is, in the case of the Texas Company, an additional problem not involved in the other two cases. That problem will be adverted to in due course.

■ The plaintiffs seek to recover Federal income taxes which they were required to pay because the Government fixed the cost basis, of ships owned by them, at a lower figure than that which the plaintiffs say was the correct figure, and thereby reduced the amount of the deduction for depreciation to which the plaintiffs claim they were entitled for the years in question.

The case of Socony Mobil Oil Company, Inc. is, in its essentials, typical of the three cases, and the facts of that case will be used in this discussion. The word plaintiff, when used without qualification, will refer to that plaintiff.

During the war years 1942, 1943, 1944, and 1945 the plaintiff bought from the United States Maritime Commission twelve ships, and paid for them a total of $28,204,659.59, mostly in cash but partly in old ships traded in by the plaintiff to the Commission.

On March 8, 1946, the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.A.Appendix, § 1735 ff., became effective. Section 1742 of the above Code citation is section 9 of the Act, which section is important in these cases.

The 1946 Act as a whole provided for the sale by the Government of ships which had been constructed for it. It prescribed formulae for setting "statutory sales prices" at which such ships would be offered for sale. In its section 9 it provided that purchasers of ships which had been sold by the Government before March 8, 1946, could apply to the Maritime Commission for an adjustment of the price which they had paid. If the adjustment was granted, a part of the higher price which they had paid would be refunded to them.

Section 9 cited above prescribes in detail the items which were to be ad-justed if a prior purchaser applied for adjustment. The section is long and complicated and will not be reprinted in this opinion. Subsection (b) of section 9 says:

> "Such adjustment shall be made, as hereinafter provided, by treating the vessel as if it were being sold to the applicant on the date of the enactment of this Act, and not before that time."

The several paragraphs of subsection (b) provide for credits to be given by the Commission to the purchaser, and other credits to be given by the purchaser to the Commission, all of which credits shall enter into the adjustment. Paragraph (4) provides that, the Commission shall credit the purchaser with the amount by which the price paid by the purchaser exceeded the statutory sales price set under the 1946 Act. Paragraph (5) provides that the Commission shall credit the purchaser with interest at $3\frac{1}{2}$ percent per annum on the excess of the original purchase price over any trade-in allowance received, from the date of the original purchase to the date of the 1946 Act. Paragraph (6) provides that the purchaser shall credit the Commission with the amount of charter hire which the United States had paid to the purchaser for the use of the vessels between the time of the purchase and the date of the Act, and that the Commission shall credit the purchaser with the charter hire which the United States would have paid for the use of the traded-in ships for the same period.

Paragraph (8) provides that there shall be deducted from the charter hire credits in favor of the Commission the amount of Federal taxes paid by the purchaser upon the charter hire received from the Government but now credited back to the Government pursuant to paragraph (6). It also provides that there shall be deducted from the credits in favor of the purchaser the amounts by which the purchaser's Federal taxes have been reduced, during the interim period, by taking deductions for depreciation and amortization on the

ships. The specific provision about such interim depreciation and amortization is in subsection (c) (1) of section 9.

Subsection (b) (8) says:

"If, after making such subtractions, the sum of the credits in favor of the applicant exceeds the sum of the credits in favor of the Commission, such excess shall be paid by the Commission to the applicant.

In the case under discussion, that of Socony Mobil Oil Company, the computation based upon the respective credits in favor of the plaintiff and the Commission showed a net credit in favor of the plaintiff of $4,615,243.23, which sum the Commission paid to the plaintiff.

These cases, as we said at the outset, require us to determine the correct basis on which the plaintiffs were entitled to compute depreciation, for the tax years in question, upon the ships bought by them from the Maritime Commission before the enactment of the Merchant Ship Sales Act of 1946, the price of which ships was readjusted pursuant to the provisions of section 9 of that Act.

The Government's contention is that the basis of the ships is their "statutory sales price" as set by the 1946 Act. If a person who had bought no ships from the Commission before March 8, 1946 had bought these ships from the Commission after that date, he would have paid the statutory sales price for them, and that would have been his cost and his basis for depreciation. If these plaintiffs, having bought the ships in question before 1946, had decided not to apply for a readjustment of their prior purchases, which they were permitted to do by section 9 of the Act, but to leave the prior transaction undisturbed and to buy some additional ships at the reduced prices of the 1946 Act, they would have paid the statutory sales prices for the additional ships, and that would have been their cost and their basis of depreciation for the additional ships. They could have gone on

taking depreciation on the prior purchased ships on their high cost basis.

In determining whether to apply for a readjustment of its prior ship purchases, the plaintiff Socony Mobil Oil Company could set its accountants to work with the several credit and debit provisions of the paragraphs of section 9. Their computations would show that, taking all the items into account, a section 9 readjustment would bring the company a check for $4,615,243.23. There would be, then, no difficulty in reaching a decision to apply for a section 9 readjustment. The application was made and the check was received.

Our task is to determine how much the ships cost the plaintiff. The plaintiff says that it paid $28,204,659.59 for the ships; that it got back $4,615,243.23 in the section 9 readjustment; that its cost was, therefore, $23,589,416.36. It concedes that that cost should be reduced by $6,565,741.95 for a reason not here in dispute, which leaves a net cost, claimed by the plaintiff, of $17,023,674.-41.

The Government's position is that the plaintiff's cost was the statutory sales price of the ships which, the parties agree, was $19,804,682.30. It would deduct from that amount the undisputed $6,565,741.95 referred to above, and arrive at the figure of $13,238,940.35. The difference of $3,784,734.06 between the cost figures arrived at by the parties is the amount on which, the plaintiff asserts and the Government denies, depreciation is deductible for Federal tax purposes.

Section 23 of the Internal Revenue Code of 1939, 26 U.S.C. (1952 Ed.) § 23, permits a deduction for depreciation of property used in the taxpayer's trade or business. Section 113 of the Code, 26 U.S.C. (1952 Ed.) § 113, says:

"The basis of property shall be the cost of such property."

It would seem that if one has bought property and paid $10,000 for it, and the seller later offers to readjust the price, according to a complicated for-

mula, and when the computation is completed, the seller gives back to the buyer $3,117.24, the property has cost the buyer $6,882.76. That being, in fact, his cost, it would seem to be his basis for computing depreciation, if the property is depreciable for tax purposes.

The Government does not deny that the plaintiff's depreciation should be based upon its cost. But it says that the plaintiff's "cost" for this tax purpose is not the difference between what it originally paid and what it got back in the section 9 readjustment. That means that the Government's asserted "cost" is not the economic, dollars-and-cents cost, but an artificial figure, legally deemed, for this tax purpose, to be the cost though it is not in fact the cost.

Congress could, of course, have provided that a former purchaser of ships who desired to take advantage of the readjustment of price offered him by section 9 should, as a condition of the readjustment, obligate himself to compute future depreciation on a basis other than actual cost. Congress could have done this expressly, or by writing a text from which such an implication would necessarily result. Congress has not done so expressly, and we do not find that it has shown an intent to do so.

A bill was considered and rejected by the House of Representatives which would have, if enacted, supported the Government's position. See H.R. 3603, 79th Cong., 1st Sess. Instead, the House of Representatives passed a bill containing a section which was essentially like the one which was finally enacted as section 9. See H.R. 3603, 79th Cong., 1st Sess., in the Senate, October 3 (Legislative Day, October 2) 1945 (as passed by the House on October 2, 1945). The Senate, however, enacted a bill containing a section which was similar to the one which had been rejected by the House of Representatives. See section 9 of H.R. 3603, 79th Cong., 1st Sess., in the Senate, December 4 (Legislative day, October 29) 1945. That bill contained a section 9(e) (1) which provided:

"If an adjustment in the purchase price of a vessel is made under this Section, the income and excess profits taxes of the vessel owner under the Internal Revenue Code for the taxable year within which the delivery of the vessel was made to the purchaser and *for subsequent taxable years,* shall be redetermined. For such purposes of redetermination *the vessel shall be considered as having been acquired at the adjusted purchase price,* and the *income and deductions attributable to such vessel shall be determined as if this Section had been in effect on the date of such delivery.* (Emphasis supplied.)"

If this Senate bill had become law, the Government's position in these cases would be clearly correct. But in conference between the two houses, the House's version was adopted, with changes not here important, and that version was enacted as section 9. See House of Representatives Conference Report No. 1526, 79th Cong., 2d Sess., to accompany H.R. 3603, dated February 6, 1946. The Conference Report makes no mention of the omission of section 9(e) (1) of the Senate bill, quoted above, but does, at page 17, mention one modification which the conference had made in the House-enacted bill. The modification had to do with the year of taxability of the amount credited by the Commission to the prior purchaser as interest on his overpayment.

This legislative history shows that the committees of Congress gave minute attention to the tax consequences, current and future, of the readjustment authorized by section 9. The bill as enacted by the Senate had in it an express provision that the statutory sales price should be the basis for future depreciation. The conference omitted this provision, and the Act as passed omitted it. There is no room for an implication that Congress, having considered and omitted it, showed, by other parts of section 9, an intent to retain it.

The Treasury took the position which the Government takes here, that the statutory sales price is the correct basis

for depreciation. Mimeograph 6366, 1949—1 Cum.Bull. 270. In 1950 the 81st Congress, 2d Session, passed H.R. 3419, which would have amended section 9(b) by adding the following paragraph at its end:

"From and after March 8, 1946 (the date of enactment of the Act), the cost basis of a vessel in respect of which the price adjustment is made shall be the undepreciated original purchase price reduced by the net amount of such adjustment in favor of the applicant resulting from the application of all of the foregoing provisions of this subsection."

■ The two Congressional committees which had considered section 9(b) when it was originally enacted considered the quoted amendment and explained in their reports that the position taken by the Treasury had made clarifying legislation necessary. See House of Representatives Report No. 1342, 81st Cong., 1st Sess., p. 2 and Senate Report No. 1915, 81st Cong., 2d Sess., p. 2. An expression of opinion as to the meaning of a statute, made some four years after the enactment of the statute by the same Congressional committee which had considered that statute at the time of its enactment, is an important circumstance for consideration in interpreting the statute. Sioux Tribe of Indians v. United States, 316 U.S. 317, 329, 62 S.Ct. 1095, 86 L.Ed. 1501.[1]

The President vetoed H.R. 3419. His veto message is in 96 Cong.Rec. pp. 15,-791–2. The fact that the bill was vetoed does not detract from its weight as evidence of the intent of Congress and its

committees in their drafting of section 9(b) in the 1946 Act.

Section 9, in its subsection (c) (2), provides that if the Government charters a ship of which the price has been readjusted under section 9, it shall not pay more per annum than 15 percent of the statutory sales price, and that if the Government loses a ship so chartered it shall not pay more than the statutory sales price, properly depreciated, for the lost ship. We see nothing in these provisions except evidence that Congress was aware, in minute detail, of the problems that would be presented by section 9 readjustments, and provided specific solutions of those problems in the statute, and did not leave them open for judicial interpretation.

The readjusted price which the plaintiffs had to pay for their ships in order to take advantage of the readjustment offered them by section 9 was more than the statutory sales price. Neither the express terms of the statute, those terms in their context, nor the relevant legislative history indicate a legislative intent that the basis for depreciation of these ships should be an artificial, legally constructed figure different from their actual mathematically computed cost.

In the case of Barber Oil Corporation v. Manning, D.C.D.N.J.1955, 135 F.Supp. 451, the court rejected the Government's position, which was the same as its position in the instant cases.

As we said at the beginning of this opinion, there is an additional problem involved in the case of the plaintiff Texaco, Inc. That plaintiff's suit re-

[1]. United States v. United Mine Workers, 330 U.S. 258, 281–282, 67 S.Ct. 677, 690, 91 L.Ed. 884, is not to the contrary. That case said only that the opinions of several Senators, some of whom had not been members of the Senate when the legislation in question had been considered, and none of whom had been members of the Committee which had reported the legislation and which opinions were expressed eleven years after the legislation had been passed, could not "serve to change the legislative intent of Congress expressed" when the legislation had been passed. Similarly, Rainwater v. United States, 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996, indicates only that an interpretation by one Congress of a statute passed by another Congress more than a half century before has "very little, if any, significance." See also the concurring opinion of Judge Littleton in Equitable Life Assurance Society v. United States, Ct.Cl., 181 F.Supp. 241, 245, and A. P. Green Export Co. v. United States, Ct.Cl., 1960, 284 F.2d 383, 386–387.

lates to its tax years 1946, 1947, 1948, and 1949. The Government has pleaded the statute of limitations as to the years 1946 and 1947. Timely claims for refund for those years were filed by the plaintiff. The Commissioner mailed statutory notices disallowing the claims. Section 3772(a) (2) of the Internal Revenue Code of 1939, 26 U.S.C. (1952 Ed.) § 3772(a) (2), provides that suits on such claims must be filed within two years after the date of the mailing of the notice of disallowance. But section 3774(b) (2), 26 U.S.C. § 3774(b) (2) provides that the Commissioner of Internal Revenue and a taxpayer may make an agreement that the running of the statute of limitations shall be suspended during the pendency in court of a test case involving the question which has arisen between the Commissioner and the taxpayer. In the instant case Texaco, Inc. and the Commissioner made an agreement that the running of the statute "is hereby suspended from the date the Commissioner signs this agreement to the date of final decision" in the case of Barber Oil Corporation v. Manning, then pending in the United States District Court for the District of New Jersey. The Barber Oil case was the case cited above. Manning was a former Collector of Internal Revenue.

At the time this agreement was made, the District Court had rendered an initial decision against the Government in the Barber Oil case, with an opinion, as cited above. Thereafter the parties to that case settled it by agreement and presented to the court a stipulation that it had been so settled and that the plaintiff's petition should be dismissed with prejudice. The court endorsed such an order upon the stipulation.

If the suspension of the running of the statute of limitations was lifted on the day of the signing of the order, the plaintiff's suit was filed too late, as to the years 1946 and 1947. The plaintiff says that the "final decision" of the Barber Oil case, within the meaning of its agreement, did not take place until 60 days after the District Court's de-

cision, 60 days being the time within which appeals may be taken from District Court decisions to the United States Courts of Appeals. The Government says that the District Court's order dismissing the case was the final decision because the plaintiff's petition was, with the plaintiff's consent, dismissed with prejudice. Of course neither party could have appealed from this order, without a showing of fraud or mistake, and the case was, in fact, finally terminated.

When the Commissioner made his suspension agreement with the plaintiff, he must have contemplated using the Barber Oil case as a test case. Section 3774(b) (2) referred to above, came into the Revenue laws as section 608 of the Revenue Act of 1928, 45 Stat. 875. Its purpose, as stated in the Senate Finance Committee Report, Senate Report No. 960, 70th Cong., 1st Sess., was to "prevent a multiplicity of suits" while a test case was pending. The Commissioner, when the Barber Oil case was decided against the Government, was in a position to pursue the test of the law by appealing to the United States Court of Appeals. Instead, the case was settled. We are not informed of the terms of the settlement, but it may be surmised that the Government paid some substantial sum to escape from the District Court's adverse decision.

It seems that such a premature termination of what was expected to be a test case would not have been anticipated by Texaco, the other party to the suspension agreement. Unless the Government advised it of the settlement, it would have had to be most diligent in watching the District Court's judgment docket in order to file its suit in time after the "final decision" of the test case.

■ We think that when the Commissioner has entered into an agreement for the suspension of the statute of limitations until the final decision in a test case, and thereafter participates in the frustration of the purpose of the agreement by preventing the test case from going to a decision on the merits,

a fair interpretation of the agreement makes the suspension run until the earlier of the following two events: (1) The other party to the agreement has had notice of the premature termination of the test case, or (2) the time for an appeal would have expired, if the problem intended to be tested had been decided by the court in which the test case was pending.

The plaintiffs are entitled to recover, with interest as provided by law, and judgments will be entered to that effect. The amounts of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.

It is so ordered.

REED, Justice (Ret.), sitting by designation, JONES, Chief Judge, and DURFEE and LARAMORE, Judges, concur.