NATIONAL BULK CARRIERS, INC.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 2010.

United States District Court
D. Delaware.

Feb. 5, 1963.

586

John E. Lewis, of Richards, Layton & Finger, Wilmington, Del., Myron Semmel, New York City, and David Boyd Chase of Chase & Bierman, New York City, of counsel, for plaintiff.

Alexander Greenfeld, U. S. Atty., Stanley C. Lowicki, Asst. U. S. Atty., Wilmington, Del., Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Edward S. Smith, Philip H. Miller, Theodore D. Peyser, Jr., Attys., and Lawrence F. Ledebur, Atty., Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., of counsel, for defendant.

CALEB M. WRIGHT, Chief Judge.

This is a timely suit for tax refund. The question presented is the proper basis for depreciation and for the computation of gain in the sale of certain vessels purchased by the plaintiff, National Bulk Carriers, from the United States Maritime Commission. The facts are stipulated and the relevant ones may be summarized as follows:

On October 6, 1944, plaintiff purchased the seagoing tank vessels "Phoenix" and "Nashbulk" from the United States Maritime Commission, and on May 24, 1945, purchased the seagoing tank vessel "Amtank". These purchases were made pursuant to Section 509 of the Merchant Marine Act, 1936, c. 858, 49 Stat. 1985 (46 U.S.C. 1952 ed., § 1159). To acquire the three vessels, the plaintiff was required to pay the Commission the sum of $7,707,957.12, of which $7,692,382.00 represented the cost of the vessels to the Commission less the cost of national defense features [1] and $15,575.12 represented interest on construction progress payments.[2] The sum of $1,503,000.00 was paid from an allowance for two vessels traded in and delivered to the Commission. Some amount was paid in cash and the balance was represented by mortgages on the three vessels. As of March 8, 1946, cash payments made by plaintiff totalled $896,425.01 and the balance of plaintiff's mortgage indebtedness was $5,306,550.11.

Upon delivery of the three vessels to the plaintiff, they were chartered by the Government. At various times during the charters, the Government paid charter-hire to the plaintiff. On its federal income tax returns for the years in which the charter-hire was paid, plaintiff reported the charter-hire as income and deducted depreciation for the vessels.

On March 8, 1946, Congress enacted the Merchant Ship Sales Act of 1946, c. 82, 60 Stat. 41 (50 U.S.C.Appendix 1952 ed., § 1735), hereinafter referred to as "the Act." Under Section 4, citizens of the United States were given the right to purchase from the United States Maritime Commission war-built vessels at the statutory sales price defined in Section 3(d). The statutory sales price is arrived at by congressional formula ensuring a uniform sales price for each class of ships. Under Section 3(d) of the Act, the statutory sales price of the three vessels purchased by plaintiff totalled $5,153,899.31. This is the price any applicant would have paid

---

1. Section 509 provides that the Government pay for the cost of national defense features.

2. The interest is the subject of a Government counterclaim that is discussed in the second part of this opinion.

if he bought the same type of ships after the war. Purchasers were required to pay at the time of sale at least 25% of the statutory sales price and the balance was payable in not more than twenty equal annual installments with interest at 3½% per annum. By January 15, 1951, 843 ships had been sold under Section 4 of the Act.

Section 9[3] of the Act authorizes adjustments for certain sales to citizens made prior to March 8, 1946. Plaintiff filed applications under Section 9 for an adjustment in the price of each of the three vessels purchased in 1944 and 1945. The applications were approved and an agreement for adjustment was entered into by the plaintiff and the Commission.

Pursuant to Section 9(b) (3), plaintiff was entitled to have its mortgage indebtedness reduced by $1,886,619.97 from $5,306,550.11 to $3,419,930.14. Plaintiff's trade-in allowance was reduced by $1,059,505.66 from $1,505,000.-00 to $445,494.34.[4]

Section 9(b) of the Act requires that certain other adjustments be made and that a net payment of cash be made by either the applicant or the Commission. There was a net credit of $1,397,283.08 in favor of the Commission.

The adjustments which gave rise to the credit of $1,397,283.08 were as follows:

(a) Section 9(b) (1) provides that, where the cash payments made before March 8, 1946, do not equal 25% of the statutory sales price, the purchaser shall pay to the Commission the difference between the amount so paid and 25% of the statutory sales price. For the three vessels in question, plaintiff's payments did not equal the 25% figure and plaintiff therefore owed the Commission for the three vessels the sum of $392,-049.82. Instead of the plaintiff making a separate payment of this amount, the Commission was given credits equal to this amount.

(b) Section 9(b) (5) provides that, for each vessel purchased, the purchaser be given a credit equal to interest at the rate of 3½% per annum on the original purchase price less any trade-in allowance from the date of delivery to March 8, 1946. By virtue of this provision, plaintiff was allowed credits totalling $234,821.77.

(c) Section 9(b) (6) provides that, for each vessel purchased, the Commission be allowed a credit equal to the charter-hire paid to the purchaser for use of the vessel prior to March 8, 1946. By virtue of this provision, the Commission was allowed credits totalling $1,-385,985.30.

(d) Section 9(b) (6) also provides that, for each vessel purchased, the purchaser shall be allowed a credit equal to the amount that would have been paid as charter-hire for bareboat use of the vessel traded in for the period from the date the vessel traded in was delivered to the Commission to March 8, 1946. By virtue of this provision, plaintiff was allowed credits totalling $406,440.31 for this hypothetical charter-hire.

(e) Section 9(c) (1) provides that the purchaser's federal taxes be recomputed on the following assumptions:

1. Depreciation and amortization on the vessels up to March 8, 1946, was not allowable.

2. Charter-hire credited to the Commission under Section 9(b) (6) was never received by the purchaser.

3. Amounts credited to the purchaser under Sections 9(b) (5) and 9(b) (6) were income for the tax-

---

3. The full text of Section 9 appears in Appendix A of this opinion.

4. The first three subsections have the effect of charging the applicant with the "statutory sales price" of the vessel, allowing him a credit for the payments already made on account of the original purchase price and readjusting the amount of the trade-in allowance. Plaintiff admits that if the statute stopped there the adjusted purchase price would be the statutory sales price. See Plaintiff's brief, instant case, p. 11.

able year in which falls March 8, 1946.

Recomputation of the plaintiff's taxes under this provision resulted in deficiencies of $260,510.04. Under Section 9(b) (8), the Commission was allowed credits totalling $260,510.04.

(f) Recapitulating, the credits were as follows:

In favor of the Commission

| | | |
|---|---|---|
| (a) | $ 392,049.82 | |
| (c) | 1,385,985.30 | |
| (e) | 260,510.04 | $2,038,545.16 |

In favor of the plaintiff

| | | |
|---|---|---|
| (b) | $ 234,821.77 | |
| (d) | 406,440.31 | 641,262.08 |

Net credit in favor of the Commission — $1,397,283.08

The plaintiff did not give the Commission a check for $1,397,283.08 and the Commission did not give the plaintiff the $1,886,619.97 reduction in mortgage indebtedness. Instead, plaintiff's mortgage indebtedness was reduced by $489,-336.89 from $5,306,550.11 to $4,817,213.-22. The reduction of $489,336.89 represents the difference between $1,886,619.-97 and $1,397,283.08. Since March 8, 1946, plaintiff has paid the Commission amounts totalling $4,817,213.22 in satisfaction of its mortgage indebtedness.

In computing plaintiff's income tax for the years in question,[5] the Commissioner of Internal Revenue allowed plaintiff a deduction for depreciation on the vessels and used as a basis the statutory sales prices of the vessels adjusted for gain and loss not recognized by reason of certain statutory provisions. Plaintiff sues for tax refund on the grounds that the proper basis for depreciation is the original purchase price of the vessels reduced by the net adjustment in the mortgage made by reason of Section 9. In other words, the plaintiff contends that all the subsections of Section 9 must be considered in computing the price of the vessels. Determination of this narrow issue will dispose of the main part of this complicated suit. Several counterclaims have been filed by the Government; they will be treated after the basic problem is determined.

### Plaintiff's Arguments

Plaintiff's basic contention is that its depreciation figure actually represents the dollar amount invested in the ships. It notes that if Section 9 had not been passed the cost of the ships would have been $6,600,000. Under Section 9 a net credit of $489,000 was allowed; therefore the cost and necessarily the basis for depreciation is roundly $6,110,000. This figure was the amount paid to the Government.

Plaintiff relies on the plain meaning of the statute, arguing that the words are clear and unambiguous in providing that all of the items were to be used in determining the amount of the adjustment in price. Specifically alluded to are the words "the amount of such adjustment shall be determined" by and the listing of the credits and debits thereafter without an attempt to differentiate their impact. To accept the Government's position would be to disregard Sections 9(b) (4)–9(b) (8), it is concluded.

While it is argued that the statute is clear on its face, plaintiff also contends that the legislative history supports its position. Counsel rely on two subsequent declarations of intent which were appended to House[6] and Senate[7] reports recommending an amendment to Section 9 that encompassed the taxpayer's position. Each of these declarations stated that it had been Congress' intent that all of the subsections were to be considered in reaching a depreciation figure.

Finally, it is argued that the fallaciousness of the Government's position is amply borne out by the five cases[8]

5. The years in issue are 1946–50, 1952, 1953, and 1955.

6. H.R.Rep. No. 1342, 81st Cong., 1st Sess. (1950).

7. S.Rep. No. 1915, 81st Cong., 2d Sess. (1950).

8. Waterman Steamship Corp. v. United States, 203 F.Supp. 915 (D.Ala.1962);

that previously rejected the contentions of the United States, as well as the Commission's acceptance of plaintiff's position.[9] Attention is drawn to the statement by one district judge who said "that the Internal Revenue Service is attempting to create confusion in an area where Congress has been most explicit in setting forth the statutory procedure." [10]

### Defendant's Arguments

The United States asserts that the Act as a whole was passed to ensure uniform sales prices for ships of the same class. Congress thought price uniformity would be conducive to the orderly disposition of the war-time fleet consistent with maintaining the economic standards of the Merchant Marine. With this background, the Internal Revenue Service argues that a literal reading of Section 9 and its legislative history conclusively demonstrate that Congress intended the pre-war contract prices to be reduced to the statutory sales price. This is accomplished by Sections 9(b)(1)–9(b)(3). The Government concludes that Congress' intent in passing the other subsections was to eliminate the benefits and detriments of pre-enactment ownership. And, that the legislative body never intended to treat all of the debits and credits as payment for the vessels in question.

Socony Mobil Oil Co. v. United States, 287 F.2d 910 (Ct.Cl.1961) (one opinion covered all 3 Ct. of Cls. cases); Texaco, Inc. v. United States, 287 F.2d 910 (Ct.Cl.1961); Mississippi Shipping Co. v. United States, 287 F.2d 910 (Ct.Cl. 1961); Barber Oil Corp. v. Manning, 135 F.Supp. 451 (D.N.J.1955).

9. A letter from the Maritime Commission to the plaintiff stated:

"On August 6, 1951, the Deputy Maritime Administrator approved your application for an *adjustment*, under the Merchant Ship Sales Act of 1946, *in the prices of the vessels* * * *. If the *adjustment* as so approved is acceptable to you in full settlement of all claims by you or on your behalf *in respect of the purchase prices of the above vessels*, please countersign * * *." (Italics supplied.)

The United States also asserts that the taxpayer's interpretation of Section 9 leads to a double tax benefit with reference to the charter hire. It reasons this way. The first benefit arises from the refund of the income tax on the charter hire. Capitalizing the charter hire for purposes of depreciation would be the second benefit. Since double tax benefits are frowned upon,[11] the Government argues that its interpretation is compelled.[12]

### Law and Decision

It is undisputed that cost is the basis for depreciation under the Internal Revenue Code. The problem raised by the case at hand involves the effect of the intent of Congress as expressed by a statute passed to deal with a specific problem on the ordinary rules of depreciation formulated under the Internal Revenue Act. Before solution is attempted, it seems appropriate to note the court's role when faced with problems of statutory construction.

■■ The fundamental goal of judicial construction is the application of the law in the spirit of the basic policy which motivated the Congress to act. To attain this objective, certain principles of construction have been developed by the Supreme Court and the lower federal courts. Where the statute is

10. Waterman Steamship Corp. v. United States, note 8 supra, 203 F.Supp. at p. 929.

11. The Bureau relies on Detroit Edison Co. v. Commissioner, 319 U.S. 98, 63 S. Ct. 902, 87 L.Ed. 1286 (1943).

12. Other arguments made by the Government include (1) that a return of a charter hire is like the return by a Government contractor under the federal renegotiation statutes, (2) the return of charter hire was not a payment by the taxpayer because the funds were not derived from the taxpayer's capital but from the Government's, (3) if the return of charter hire is includible in cost then its prior receipt would be considered an offset to cost, and (4) if the return of charter hire were included in depreciation basis, there would be absurd results.

plain and unambiguous a court may not refer to the legislative history of a bill.[13] But, when a statute is ambiguous courts need not limit their search to sources embodied in the Act.[14] Extrinsic aids such as reports of committees, statements made at hearings or during the course of floor debate and similar material may be used to glean the legislature's intent.[15]

■ Section 9 is sufficiently unclear to justify resort to legislative history. This is not to say that the plaintiff's basic argument—the statute cannot be read literally to differentiate the legal impact of some subsections from the others—does not have merit. It does to the extent Congress did not specifically state in headings that 9(b) (1)–9(b) (3) shall effect the change in price and the other subsections are to eliminate the benefits and detriments of pre-enactment ownership and are irrelevant to cost. There is room to read Section 9 as one indivisible formula. However, there is ample, if not overwhelming, support for the position of the United States in the language of the statute.

Subsection (b) states that "Such adjustment shall be made * * * by treating the vessel as if it were being sold to the applicant on the date of the enactment of this Act * * *, and not before that time." If the ships were sold on the date of enactment their cost would have been the statutory sales price. The latter would necessarily have been the basis for depreciation. This language introduces and is the framework of the adjustment provisions. It forcibly suggests that Congress intended all ships of the same class to be depreciated on the same basis without reference to date of purchase.

It is agreed by the parties that the application of Sections 9(b) (1)–9(b) (3) would reduce the original contract price to the statutory sales price. The problem arises from the fact that Congress did not stop there; it provided for further adjustment. While the legislature has not interlined any distinguishing language between those sections that bring the contract price down to the statutory sales price and the other sections, a close reading suggests that the legislature may have had some distinction in mind. Section 9(b) (3) involves the situation where the purchaser only makes part payment and owes the balance. It says apply certain adjustments to the mortgage, the net effect of which is to charge the applicant with the statutory sales price. The section says the amount of "the adjusted mortgage indebtedness shall be * * *." This is somewhat different from 9(b) (5) and 9(b) (6) which start out "the parties ' * * * shall credit * * *.'" These sections look to the immediate exchange of cash after all the credits and debits have been added; Congress has so provided. The two different modes of adjustment suggest that Congress contemplated two severable transactions.[16] If the legislature intended that all the adjustments be considered part of cost, it would have been logical to provide that all adjustments be applied first to the mortgage indebtedness.[17]

13. See e. g., Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944, 959, 93 L.Ed. 1207 (1949); United States v. Rice, 327 U.S. 742, 66 S.Ct. 835, 90 L.Ed. 982 (1946). See generally, Frank. Words and Music; Some Remarks on Statutory Interpretation, 47 Colum.L.Rev. 1259 (1947).

14. E. g., ICC v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945); NLRB v. Hearst, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Cohen, The Value of Value Symbols in the Law, 52 Colum.L.Rev. 893 (1952).

15. For a full discussion of the importance of each type of extrinsic aid, see 2 Sutherland, Statutory Construction, §§ 5001–5016 (Horack ed. 1943).

16. Section 9(b) (4) applies when the applicant has paid in cash more than the statutory sales price. Then, unlike 9(b) (3), the adjustment is made by means of a credit. However, this would not seem to subvert the above argument because here Congress has no practical, alternative means of adjustment.

17. It should be noted that the Commission, in this case, actually applied all the adjustments against the mortgage. This is conceded to be erroneous and contrary to the statute.

In support of the Government's position, several other arguments may be drawn from the text of the statute. The theory that Congress provided one indivisible formula is inconsistent with the fact that there are several different modes of adjustment. Under Section 9 (c) (2) the Government's liability for the loss of a vessel adjusted under Section 9 and chartered to the Government is limited to the statutory sales price depreciated to the date of loss. If the new price is not the statutory sales price, this provision is without meaning. Finally, it should be noted that the caption of the section does not include the phrase "price adjustment" as reported in U.S.C. In the official statute the broader phrase "adjustment for prior sales to citizens" is used.[18]

The presence of logical arguments supporting two interpretations of the same language compel the conclusion that the statute is ambiguous. Guidance must be sought in the legislative history of the Act, if construction of the statute is to be consistent with the legislative intent.

At the outset, it is important to take a broad view of the Act as a whole. During World War II the United States had accumulated a vast fleet of cargo carriers and at War's end it became necessary to dispose of these ships.[19] The legislature's objectives were twofold: to dispose of the fleet in an orderly fashion and at the same time maintain a vigorous and healthy Merchant Marine.[20] Ruinous competition was feared. Congress sought to obtain its basic goals through the implementation of a firm pricing policy for the sale of war-built vessels and the establishment of an inactive merchant vessel reserve promptly available for security needs, but frozen so far as commercial use is concerned.[21]

After studying the legislative history of Section 9, one inescapable conclusion concerning legislative intent appears. Congress meant to put pre-Act and post-war purchasers on exactly the same basis—their shoes were to be interchangeable. Using this fact as a major premise it becomes clear that all buyers were to pay one price, the statutory sales price. This conclusion is supported directly as well as inferentially by the legislative history. It is entirely consistent with the Act's general goals which encompass a firm pricing policy.[22]

Section 9, as enacted, can be traced to a floor amendment offered by Representative Jackson, chairman of the subcommittee in charge of amendments to the bill.[23] The day before it was offered the purpose of the amendment was explained. Mr. Jackson said:

"Section 9 of HR 3603 provides for a refund to operators who purchased vessels during the war, at war cost, back to the statutory sales price contained in section 3 of the Act. Such an adjustment is fair. We do not want to place the wartime purchaser at a disadvantage with his competitor who acquires a similar vessel under the provisions of this bill.

"However, section 9 contains many loopholes which in my opinion places the wartime purchaser in a far better position than future purchasers.

18. See 60 Stat. 46.

19. See S.Rep. No. 807, 79th Cong., 1st Sess., 1–2 (1945); H.R.Rep. No. 831, 79th Cong., 1st Sess., pp. 1–2 (1945). See also American President Lines v. United States, 162 F.Supp. 732 (D.Del. 1958).

20. Ibid.

21. See S.Rep. No. 807, 79th Cong., 1st Sess., p. 1 (1945).

22. If the general goal of the Act involves firm prices, to allow purchasers of the same type of vessel to have different basis for depreciation would be to subvert the basic objective.

23. See 91 Cong.Rec. 9182 (1946). While the use of floor debates to determine legislative intent is not looked on with favor, an exception is made for the chairman in charge of the bill. His statements are in the nature of supplemental committee reports and are entitled to the same weight. See 2 Sutherland, op. cit., at §§ 5011–12.

For one thing, the wartime purchaser, under section 9, would be allowed trade-in allowances far in excess of those provided under the committee amendment to section 8.

"If there is to be equality between the past and future purchasers there must be comparable terms and nothing less. * * * I have proposed certain modifications to section 9 of H.R. 3603 which has been accepted as a committee amendment. *The effect of this amendment is to treat prior sales as having taken place on the date of the enactment of this bill.* The operator is compensated for all actual money investment to date by an allowance of $3\frac{1}{2}\%$ interest thereon." [24] (Emphasis supplied.)

No clearer statement in support of the Government's position could be made. Yet, sole reliance need not be placed on it. The same theme runs throughout the House debates.[25]

The House [26] and Senate [27] reports which were made before the proffer of the amendment, and the subsequent conference report [28] are entirely consistent with and in support of the main thesis of the House debates. They demonstrate that the Congress intended to reduce the original contract price to the statutory sales price and to eliminate the benefits and detriments of pre-enactment ownership with other adjustments.

The Senate emphasized the need for a firm pricing policy. The report stated: "[U]nless adjustments were made in connection with these prior sales to conform to the selling price prescribed in the bill, there would be strong likelihood of breaking down or attempts to break down the firm pricing policy on the ground that the failure to make such adjustment would be unwarranted discrimination against earlier purchasers." [29]

The Senate adjustment equaled the excess of the original purchase price (depreciated at a certain rate) over the statutory sales price as of the date of enactment.[30] Conditions on the adjustment rather than parts of the whole, included return of a portion of the charter hire.

The House report also emphasized the need for a firm pricing policy and stated with clarity the effect of its version of Section 9 which was eventually amended. It said: "the effect of making the adjustment is the same as if the bill had been enacted at the beginning of the war period and *all sales during the war period had been at the statutory sales price.*" [31] Conditions for receiving the adjustment involved treating the sale for all purposes as if it were made under the bill; thus, for example, a portion of the charter hire had to be returned. The logical conclusion to be drawn from both the House and Senate reports is that at all times, the Congress had only one idea in mind—to treat the Section 9 ap-

---

24. See 91 Cong.Rec. 9182–9185 (1946).

25. E. g., at page 9282, Mr. Jackson stated: "The committee amendment treats all of these prior sales as being made on the date of the bill's enactment and not before that time, so that the previous purchaser and a future purchaser will be put on exactly the same basis. In order to accomplish this result it is necessary to unwind a previous transaction, and most of the provisions which appear complicated are the provisions describing how this unwinding is done."
At page 9284, Mr. Bradley stated: "The purpose of the amendment is to put everybody on the same basis as of the date of the enactment of the leg-

islation." See generally 9281–9284. There is some contrary authority. Mr. Buck denominated the amendment as "a shot in the dark", and opposed on the grounds that adoption of the amendment would be acting without knowledge.

26. H.Rep. No. 831, 79th Cong., (1945).

27. S.Rep. No. 807, 79th Cong., 1st Sess. (1945).

28. H.Conference Rep. No. 1526, 79th Cong., 2d Sess. (1945).

29. S.Rep. at p. 19.

30. Ibid.

31. H.Rep. at p. 12.

plicants as if they purchased on the date the Act was passed.

The basic difference between the House bill and the final Senate version are set forth in the conference report. To be noted, however is the recognition in the report that both versions provided for "(1) adjustment of the original purchase price, (2) adjustment of the charter hire, (3) adjustment of trade-in allowance in connection with the prior original purchase, and (4) adjustments of taxes paid on account of ownership in the vessel."[32] Neither House had urged one indivisible formula of adjustment; both Houses treated the adjustment in purchase price as one complete and severable transaction.[33]

In the face of this clear and persuasive legislative history, plaintiff argues that the Congressional intent, as evidenced by subsequent reports of the 81st Congress,[34] supports its position. There can be no doubt that these reports unequivocally state that it had been the intent of the 79th Congress to include all adjustments in the depreciation base. However, these statements are entitled to little or no weight. In Fogarty v. United States,[35] the Supreme Court said that "If there is anything in these subsequent events at odds with our finding of the meaning of § 3, it would not supplant the contemporaneous intent of the Congress which enacted the Lucas Act." This principle is dispositive of the plaintiff's contention.[36]

Because of the strength of the legislative history and the support found in the language of Section 9, this court, in a case of first impression, would unhesitatingly rule for the Government. However, three lower federal courts have reached the opposite result,[37] and it is thus contended that principles of stare decisis and uniformity justify decision for the plaintiff. This argument must be rejected. All three cases were decided by different courts of co-ordinate level. The two district courts did not deal with the problem in extenso and decided the cases on different grounds from the ones set out in this opinion.[38] The Court of Claims did go into the legislative history, but the Court respectfully differs on the conclusions to be drawn concerning the intent of the legislature.[39] It is for the Supreme Court or Congress to conclusively determine this problem.

A decision for the taxpayer would be contrary to the equitable principles that motivated the Congress to act. A larger depreciation basis for war-time buyers of the same class of ships would give

32. H.Conference Rep. at p. 17.

33. The House bill was explained on the same basis as always—i. e., it treats all purchasers as if they bought on the day of enactment—and the conference agreement restored the House provisions. H. Conf.Rep. at p. 17.

34. S.Rep. No. 1915, 81st Cong., 2d Sess. (1950); H.R.Rep. No. 1342, 81st Cong., 1st Sess. (1950).

35. 340 U.S. 8, 71 S.Ct. 5, 95 L.Ed. 10 (1950).

36. This court is cognizant of the rule of the Sioux Indian case—i. e., a subsequent expression of opinion as to the meaning of a statute by the same committee which had considered that statute is an important circumstance in interpreting the statute. Sioux Tribe of Indians v. United States, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942). However, Fogarty was decided after the Sioux Tribe case and therefore the former must be followed.

37. See cases note 8, supra.

38. The basic reasoning in Barber Oil was that the refund of charter hire was "not actually paid to the Commission by the plaintiff and it would be mathematically erroneous to subtract it from plaintiff's payments." 135 F.Supp. at 460. In Waterman, the court reasoned that the "economic cost" must be the taxpayer's basis under the code. See 203 F.Supp. at 929.

39. The Court of Claims noted that if the Senate bill had passed, the Government's position would be correct. But, since the House bill was enacted the Government's view had to be rejected. See 287 F.2d at 913–914.

594

them a substantial competitive advantage over similar situated, post-war buyers.[40] With the language and the background of the legislation in mind, the Government must prevail.

### The Government Counterclaims

The sole issue remaining before the court is whether the term "original purchase price" as used in Section 9 of the Act includes interest paid by the taxpayer to the Government on construction progress payments which the United States paid to shipbuilders in the taxpayer's behalf.[41] If the statutory term does not include the interest the Government should prevail in its counterclaim to recover allegedly erroneous credits granted under Section 9 by the Maritime Commission. The facts are stipulated and their detailed exposition is necessary to an understanding of the posed issue.

Section 509 [42] of the Merchant Marine Act of 1936 [43] allows any citizen to make application to Maritime for aid in the construction of a new vessel. The section specifies certain conditions applicable to all approved applications, namely:

(1) The Commission shall pay for the cost of national defense features;

(2) depending on the ship's specifications, the applicant must pay from 12½–25 percent of the cost of the vessel (excluding national defense features);

(3) the balance of the purchase price is to be paid in 25 years with interest at the rate of 3½ percent secured by a preferred mortgage in favor of the government.

In Section 502(c) [44] of the 1936 Act Congress listed further conditions applicable to all approved transactions. They were

(1) the cash payment (ordered under § 509) had to be made at the time and in the same proportion as provided for the payment on account of construction cost in the contract between the shipbuilder and the Commission,

(2) the applicant, had to pay, not less frequently than annually, interest at the rate of 3½ percent on those portions of the Commission's payments as made to the shipbuilder which were chargeable to the applicant's purchase price (after deduction of the applicant's payments), and

(3) the balance of the purchase price had to be paid in 25 years and 3½ percent interest was due the Government on the unpaid balance.[45]

---

40. It should be noted that under 9(b) (5) pre-Act purchasers are fully compensated for their war-time investment. This was the keystone to putting all buyers on exactly the same basis.

41. The United States also filed a counterclaim which was contingent on its losing the main suit.

42. 46 U.S.C. § 1159 (1958).

43. 46 U.S.C. §§ 1101–1294 (1958).

44. 46 U.S.C. § 1152 (1958).

45. A hypothetical fact situation can be used to demonstrate the operations of these sections of the 1936 Act. Assume A, a shipper, applies to Maritime for aid in construction of a tanker and it is approved. The Commission then goes out and contracts with a shipbuilder for the construction of the vessel. The ship's cost is $800,000 and the cost of national defense features is $200,000. Maritime pursuant to the agreement makes four progress payments of $250,000. Assume A has an obligation to make a 25 percent cash or down payment. He then would have to pay $200,000 in four payments of $50,000 each. Necessarily, that means the Government has paid in progress payments $600,000 which is applicable to purchase price. Under Section 502(c) A would owe 3½ percent interest per annum on that $600,000. However, when the ship is delivered A would take a 25 year mortgage and pay 3½ percent per annum on the balance of the purchase price. Thus, the Section 502(c) obligation to pay interest on progress payment only lasts as long as it takes to build and deliver the vessel.

The Government counterclaim involves the S.S. Phoenix and the S.S. Nashbulk both of which were bought under Section 509.[46] The cost of constructing the Phoenix exclusive of national defense features was $2,510,000 and the statutory interest chargeable under 502(c) to the taxpayer was $4,285.84. Exclusive of national defense features the Nashbulk cost $2,581,600 and the interest on progress payments was $11,289.28.[47]

The original purchase contracts between Maritime and National Bulk Carriers treated the interest on progress payments as part of the purchase price.[48] With the passage of the Merchant Ship Sales Act of 1946 the taxpayer applied for and received a Section 9 adjustment. In the adjustment agreement, the interest was included in the original purchase price.[49] Through the operation of 9(b) (1)–9(b) (3) the inclusion of the interest in the original purchase price allows the taxpayer to recover that amount through credits.[50] Also, under 9(b) (5) the applicant receives interest on the interest it paid on progress payments.[51] The Government seeks to recover the $15,575.12 of interest and $621.53 which represents alleged illicit interest on interest.

## Government Contentions

While admitting that the original contract as well as the adjustment agreements treats the interest as part of the original purchase price, the Government asserts that it nevertheless is not barred from recovery. It is argued that original purchase price is defined and controlled by statute. To the extent the agreements are in conflict with statute, the latter must prevail. This conclusion follows, it is argued, from the well known

46. National Bulk Carrier's suit also involves a third vessel—S.S. Amtank—which is not involved here.

47. Thus, the total "cost" of each vessel may be derived as follows:

| | | | |
|---|---|---|---|
| S.S. Phoenix: | Contract Price | $2,510,000.00 | |
| | Interest | 4,285.84 | |
| | | $2,514,285.84 | |
| S.S. Nashbulk: | Contract Price | $2,581,600.00 | |
| | Interest | 11,289.28 | |
| | | $2,592,289.28 | $5,107,175.12 |

Plaintiff provided for payment in this way:

| | | |
|---|---|---|
| Cash payments | $ 410,000.00 | |
| Trade-in Allowance | 710,000.00 | |
| Mortgage Indebtedness | 3,937,175.12 | $5,107,175.12 |

48. The contracts stated as follows: "ARTICLE 3. *Purchase Price of New Vessels.* The Buyer agrees to pay at the times and in the manner hereinafter set forth as purchase price of the New Vessels the full cost thereof to the Commission, including outfitting and equipping the New Vessels, exclusive of the cost of national defense features, upon completion and delivery in accordance with said Construction Contracts, and including interest at the rate of $3\frac{1}{2}$ per centum per annum on payments made by the Commission on account of the cost of construction * * *."

49. The various credits and countercredits are set forth in the first part of the opinion.

50. Under those sections the original purchase price is reduced to the statutory sales price. Thus, the higher the purchase price the greater the credit. See supra.

51. This section is designed to compensate the buyer for his pre-Act investment. See supra.

principle that the Government is not bound by unauthorized acts of its agents.

Turning to statutory authority, the Government cites the texts of Sections 502(c) and 509 as clearly demonstrating that original purchase price was exclusive of interest on progress payments. Essentially, it is argued that original purchase price is cost to the Government and not to the owner. And, that the interest is merely payment for the "use of Government money" and not part of purchase price.

### Taxpayer Arguments

The basic argument of the taxpayer is that the contract of purchase is clear and unambiguous in stating that the purchase price included the interest payments. It contends that a particular item of price does not cease to be part of the whole because it is measured by reference to some other item. National Bulk Carriers cites the Waterman case as holding precisely contrary to the Government position and thereby concludes that the counterclaim is demonstrated to be without merit. Finally, the taxpayer assumes arguendo that the credits were erroneous, but asserts that recovery still cannot be had because the adjustment contract drawn under Section 9 of the 1946 Act was in full settlement of all claims and bound both parties thereto.

### Law and Decision

■ In 9(b) (1), 9(b) (4), and 9(b) (5) Congress used the phrase "original purchase price." No more language appears in explanation of the concept. The phrase must be given the meaning that best advances and is most consistent with the basic policy of the Act of 1946.[52] To do this all evidence relevant to the intent of Congress must be examined.

It would seem that Congress could have intended "original purchase price" to encompass either of two valuations: the contract price between Maritime and the shipbuilder exclusive of national defense features; or the total cost to the buyer to gain possession of the vessel. There is nothing intrinsic in the phrase that compels one or the other conclusion. Necessarily, the legislative history of the bill must be scrutinized.

In the House and Senate reports there is no specific reference to the meaning of "original purchase price." The legislative history does indicate a clear intent on the part of the Congress to unwind the previous transaction—to put all buyers of the same type vessel on equal footing. Using that principle as a major premise, it is clear that the Government must fail on its counterclaim.

■ A post-war purchaser buys a ship at the statutory sales price. Usually, he will make payment with cash, trade-in and a $3\frac{1}{2}$ percent mortgage. By the operation of Section 9 a pre-Act buyer also pays the statutory sales price and will provide for payment in the same manner as the post-war buyer. However, he may be saddled with the additional burden of paying interest on progress payments. Moreover, this interest is based on a much higher total price than the statutory sales price. A post-Act buyer would not be faced with the burden of paying interest on progress payments; under Section 3 of the 1946 Act he receives a war-built vessel. Thus, the logical corollary of Congress' intent to put all purchasers on the same basis would be the complete return of interest on progress payments. The necessary effect of 9(b) (1)–9(b)(3) is to do just this. An interest deduction would not suffice. By interpreting "original purchase price" to be the total cost to the buyer—contract price plus interest—the basic intent of Congress is furthered. Neither the post-war nor pre-Act buyer has any competitive advantage. They both pay the same price for the ship, the statutory sales price.

---

52. The Government's main arguments revolve around the text of the 1936 Act. The relevance of the text of the 1936 statute is open to question since it is the 1946 Act that is being applied.

The correctness of this result is buttressed by two cases which also reject the Government position[53] as well as the Maritime Commission's own interpretation of the Act.[54] The latter is entitled to great weight as Maritime is the Commission charged with the administration and enforcement of the statute.[55]

The Government's final contention is that plaintiff should not be allowed to recover "interest on interest" under 9 (b) (5). This contention does not accord with Congress' intent to put all buyers on the same basis. Since interest on progress payments is included in "original purchase price" the buyer pays interest on it as part of his mortgage obligation. This fact is equitably counterbalanced by the 9(b) (5) provision.[56]

Judgment is granted for the United States on the main claim, and for the plaintiff on the Government's counterclaim.

Submit order.

## APPENDIX A

"§ 1742. Price adjustment on prior sales to citizens—

(a) Form, manner, and time of application

"A citizen of the United States who on the date of the enactment of this Act [March 8, 1946]—

"(1) owns a vessel which he purchased from the Commission prior to such date, and which was delivered by its builder after December 31, 1940; or

"(2) is party to a contract with the Commission to purchase from the Commission a vessel, which has not yet been delivered to him; or

"(3) owns a vessel on account of which a construction-differential subsidy was paid, or agreed to be paid, by the Commission under section 504 of the Merchant Marine Act, 1936, as amended [section 1154 of Title 46], and which was delivered by its builder after December 31, 1940; or

"(4) is party to a contract with a shipbuilder for the construction for him of a vessel, which has not yet been delivered to him, and on account of which a construction-differential subsidy was agreed, prior to such date, to be paid by the Commission under section 504 of the Merchant Marine Act, 1936, as amended [section 1154 of Title 46]; shall, except as hereinafter provided, be entitled to an adjudgment in the price of such vessel under this section if he makes application therefor, in such form and manner as the Commission may prescribe, within sixty days after the date of publication of the applicable prewar domestic costs in the Federal Register under section 3(c) of this Act [section 1736(c) of this Appendix]. No adjustment shall be made under this section in respect of any vessel the contract for the construction of which was made after September 2, 1945, under the provisions

---

53. New York & Cuba Mail Steamship Co. v. United States, 172 F.Supp. 684 (Ct. of Cl.1959); Waterman Steamship Corp. v. United States, supra.

54. The contract of purchase as well as the adjustment agreement between plaintiff and Maritime treat interest on progress payments as part of "original purchase price." See supra.

55. For cases so holding see e. g. NLRB v. Hearst, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Hammond v. Hull, 76 U.S.App.D.C. 301, 131 F.2d 23 (1942); Brannan v. Stark, 72 S.Ct. 433, 96 L.Ed. 497, 185 F.2d 871 (1950).

This argument does not apply with the same force to the main claim. There,

there was no problems of interpretation for the Commission. It merely applied Section 9 and was not faced with the depreciation basis issue. The interpretation of "original purchase price" was something the Commission had to do in order to give the plaintiff the proper credit. Also, the evidence of the Commission's position on the depreciation issue is not overly persuasive. See note 9, supra. At any rate, the Maritime interpretation is entitled to great weight but is not conclusive.

56. See Waterman v. United States, note 8 supra, at 84,065, holding that interest on progress payments is part of original purchase price for 9(b) (5) purposes.

of title V [sections 1151–1161 of Title 46] (including section 504 [section 1154 of Title 46]) or title VII of the Merchant Marine Act, 1936, as amended [sections 1191–1204 of Title 46].

### "Determination of amount

"(b) Such adjustment shall be made, as hereinafter provided, by treating the vessel as if it were being sold to the applicant on the date of the enactment of this Act [March 8, 1946], and not before that time. The amount of such adjustment shall be determined as follows:

"(1) The Commission shall credit the applicant with the excess of the cash payments made upon the original purchase price of the vessel over 25 per centum of the statutory sales price of the vessel as of such date of enactment [March 8, 1946]. If such payment was less than 25 per centum of the statutory sales price of the vessel, the applicant shall pay the difference to the Commission.

"(2) The applicant's indebtedness under any mortgage to the United States with repect to the vessel shall be adjusted.

"(3) The adjusted mortgage indebtedness shall be in an amount equal to the excess of the statutory sales price of the vessel as of the date of the enactment of this Act [March 8, 1946] over the sum of the cash payment retained by the United States under paragraph (1) [of this subsection] plus the readjusted trade-in allowance (determined under paragraph (7) [of this subsection]) with respect to any vessel exchanged by the applicant on the original purchase. The adjusted mortgage indebtedness shall be payable in equal annual installments thereafter during the remaining life of such mortgage with interest on the portion of the statutory sales price remaining unpaid at the rate of 3½ per centum per annum.

"(4) The Commission shall credit the applicant with the excess, if any, of the sum of the cash payments made by the applicant upon the original purchase price of the vessel plus the readjusted trade-in allowance (determined under paragraph (7) [of this subsection]) over the statutory sales price of the vessel as of the date of the enactment of this Act [March 8, 1946] to the extent not credited under paragraph (1) [of this subsection].

"(5) The Commission shall also credit the applicant with an amount equal to interest at the rate of 3½ per centum per annum (for the period beginning with the date of the original delivery of the vessel to the applicant and ending with the date of the enactment of this Act [March 8, 1946]) on the excess of the original purchase price of the vessel over the amount of any allowance allowed by the Commission on the exchange of any vessel on such purchase; the amount of such credit first being reduced by any interest on the original mortgage indebtedness accrued up to such date of enactment and unpaid. Interest so accrued and unpaid shall be canceled.

"(6) The applicant shall credit the Commission with all amounts paid by the United States to him as charter hire for use of the vessel (exclusive of service, if any, required under the terms of the charter) under any charter party made prior to the date of the enactment of this Act [March 8, 1946], and any charter hire for such use accrued up to such date of enactment and unpaid shall be canceled; and the Commission shall credit the applicant with the amount that would have been paid by the United States to the applicant as charter hire for bare-boat use of vessels exchanged by the applicant on the original purchase (for the period beginning with date on which the vessels so exchanged were delivered to the Commission and ending with the date of the enactment of this Act [March 8, 1946]).

"(7) The allowance made to the applicant on any vessel exchanged by him on the original purchase shall be readjusted so as to limit such allowance to the amount provided for under section 8 [section 1741 of this Appendix].

"(8) There shall be subtracted from the sum of the credits in favor of the

Commission under the foregoing provisions of this subsection the amount of any overpayments of Federal taxes by the applicant resulting from the application of subsection (c) (1) [of this section], and there shall be subtracted from the sum of the credits in favor of the applicant under the foregoing provisions of this subsection the amount of any deficiencies in Federal taxes of the applicant resulting from the application of subsection (c) (1) [of this section]. If, after making such subtractions, the sum of the credits in favor of the applicant exceeds the sum of the credits in favor of the Commission, such excess shall be paid by the Commission to the applicant. If, after making such subtractions, the sum of the credits in favor of the Commission exceeds the sum of the credits in favor of the applicant, such excess shall be paid by the applicant to the Commission. Upon such payment by the Commission or the applicant, such overpayments shall be treated as having been refunded and such deficiencies as having been paid. For the purposes of this subsection, the purchase price of a vessel on account of which a construction-differential subsidy was paid or agreed to be paid under section 504 of the Merchant Marine Act, 1936, as amended [section 1154 of Title 46], shall be the net cost of the vessel to the owner.

"Conditions binding on applicant

"(c) An adjustment shall be made under this section only if the applicant enters into an agreement with the Commission binding upon the citizen applicant and any affiliated interest to the effect that—

"(1) depreciation and amortization allowed or allowable with respect to the vessel up to the date of the enactment of this Act [March 8, 1946] for Federal tax purposes shall be treated as not having been allowable; amounts credited to the Commission under subsection (b) (6) [of this section] shall be treated for Federal tax purposes as not having been received or accrued as income; amounts credited to the applicant under subsection (b) (5) and (6) [of this section] shall be treated for Federal tax purposes as having been received and accrued as income in the taxable year in which falls the date of the enactment of this Act [March 8, 1946];

"(2) the liability of the United States for use (exclusive of service, if any, required under the terms of the charter) of the vessel on or after the date of the enactment of this Act [March 8, 1946] under any charter party shall not exceed 15 per centum per annum of the statutory sales price of the vessel as of such date of enactment [March 8, 1946]; and the liability of the United States under any such charter party for loss of the vessel shall be determined on the basis of the statutory sales price as of the date of the enactment of this Act [March 8, 1946], depreciated to the date of loss at the rate of 5 per centum per annum; and

"(3) in the event the United States, prior to the termination of the existing national emergency declared by the President on May 27, 1941, uses such vessel pursuant to a taking, or pursuant to a bare-boat charter made, on or after the date of the enactment of this Act [March 8, 1946], the compensation to be paid to the purchaser, his receivers, and trustees, shall in no event be greater than 15 per centum per annum of the statutory sales price as of such date.

"Applicability of other laws

"(d) Section 506 of the Merchant Marine Act, 1936, as amended [section 1156 of Title 46], shall not apply with respect to (1) any vessel which is eligible for an adjustment under this section, or (2) any vessel described in clauses (1)–(3), or (4) of subsection (a) of this section, the contract for the construction of which is made after September 2, 1945, and prior to the date of enactment of this Act [March 8, 1946]. Mar. 8, 1946, c. 82, § 9, 60 Stat. 46."