**NATIONAL BULK CARRIERS, INC.,** Appellant,

v.

**UNITED STATES of America.**

**NATIONAL BULK CARRIERS, INC.,**

v.

**UNITED STATES of America,** Appellant.

**Nos. 14483, 14484.**

United States Court of Appeals Third Circuit.

Argued Dec. 5, 1963.

Decided May 8, 1964.

David I. Granter, Dept. of Justice, Washington, D. C., for appellee in No. 14,483.

Myron Semmel, New York City, for appellee in No. 14,484.

Before STALEY, GANEY and SMITH, Circuit Judges.

STALEY, Circuit Judge.

The primary question posed by these appeals is whether the district court correctly determined the cost basis for tax purposes of three vessels purchased by the plaintiff from the United States, the prices of which were adjusted pursuant to the Merchant Ship Sales Act of 1946, 50 U.S.C.Appendix, §§ 1735–1746 (1958 ed.). The district court held that the cost basis of these vessels is their "statutory sales price" as computed under the Act, rejecting the plaintiff's contention that all of the adjustments and credits referred to in § 9(b) of the statute, 50 U.S.C.Appendix, § 1742, must be applied to determine the proper cost basis. 214 F.Supp. 585 (D.Del.1963).

The operative facts have been stipulated and are fully summarized in the opinion of the district court. Accordingly, they will be repeated here only in such brief outline form as is essential to a determination of the issues raised in this court.

Myron Semmel, New York City, (Chase & Bierman, New York City, Richards, Layton & Finger, Wilmington, Del., on the brief), for appellant in No. 14,483.

Sherman L. Cohn, Dept. of Justice, Washington, D. C., (John W. Douglas, Asst. Atty. Gen., John B. Jones, Jr., Acting Asst. Atty. Gen., Stephen B. Swartz, Lee A. Jackson, I. Henry Kutz, David I. Granger, Attys., Dept. of Justice, Washington, D. C., Alexander Greenfeld, U. S. Atty., on the brief), for appellant in No. 14,484.

The plaintiff purchased the vessels in question during the Second World War at a price of $7,707,957.12.[1] A portion of this price was paid from an allowance for two vessels traded in at the time of the purchases. The new vessels were then chartered by the Government, and on its Federal tax returns plaintiff reported this charter hire as income for the years in which it was received, in addition to making depreciation deductions for the vessels. Following the enactment of the Merchant Ship Sales Act of 1946, the plaintiff applied for a price adjustment under § 9 of the statute.

1. This amount includes $15,575.12 representing interest on construction progress payments. The Government's counter-

claim for the latter amount is treated later in this opinion.

The adjusted "statutory sales price" of the three vessels as computed in accordance with § 3(d) was $5,107,796.02.[2] Accordingly, under § 9(b) (3), the outstanding mortgage indebtedness was reduced by $1,886,619.97. However, § 9(b) provides for additional adjustments, more fully discussed later in this opinion, including a credit to the Maritime Commission for all amounts of charter hire paid for the use of the vessels prior to the date of the Act, a credit to the applicant for charter hire he would have received for the use of any vessel traded in at the time of the original purchase, and a recomputation of Federal tax liability based on these adjustments. These additional adjustments resulted in a credit of $1,397,283.08 in favor of the Maritime Commission. This amount was then deducted from the $1,886,619.97 credit due the plaintiff on its mortgage indebtedness, resulting in a net reduction in mortgage indebtedness of $489,336.89. The plaintiff then subtracted that amount from the agreed upon cost basis of the vessels as of the date of the Act, $6,602,-366.17 to arrive at $6,113,029.28 as its cost basis under the statute. Its depreciation deductions for the tax years in question, 1946–1953 and 1955, were based on that figure.[3]

The United States, on the other hand, successfully contended in the plaintiff's suit for tax refund in the district court that the proper cost basis of the vessels is their adjusted "statutory sales price," $5,107,796.02, or $1,005,233.26 less than the figure used by the plaintiff. This judgment was premised on the view that the additional adjustments required by § 9 were merely intended to eliminate the benefits and detriments of pre-enactment ownership and were not to be considered in determining the cost basis of the vessels.

Section 9(b), 50 U.S.C.Appendix, § 1742, contains detailed provisions for determining the amount of the price adjustment on prior sales to citizens. We think it inappropriate to set forth that section in its entirety but shall briefly summarize it. The first sentence of the section states that the adjustment in price "shall be made, as hereinafter provided, *by treating the vessel as if it were being sold to the applicant on the date of the enactment of this Act [March 8, 1946], and not before that time.* The amount of such adjustment shall be determined as follows * * *." (Emphasis supplied.) Eight comprehensive paragraphs follow this declaration. Paragraph (1) requires an initial payment of 25% of the statutory sales price of the vessel. Any payments made upon the original purchase price in excess of that amount are credited to the applicant, and if such payments were less than that proportion of the statutory sales price the difference must be paid to the Maritime Commission. Paragraphs (2) and (3) readjust the mortgage indebtedness to an amount equal to the excess of the statutory sales price over the sum retained by the United States under Paragraph (1) plus the readjusted trade-in allowance (computed under Paragraph 7) of any vessel exchanged by the applicant on the original purchase. Thus, these three paragraphs charge the applicant with the statutory sales price of the vessel.

The credit allowed in Paragraph (4) is not applicable to the case at bar. Paragraph (5) credits the applicant with interest for the loss of his investment at the rate of 3½% per annum from the date of the original delivery of the vessel to the date of the Act. Paragraph (6) requires the applicant to credit the Maritime Commission with all amounts paid by the United States as charter hire for the use of the vessel prior to the date of the Act. Conversely, the Commission is required to credit the appli-

---

**2.** This amount represents the statutory sales price of the vessels, $5,153,899.31, adjusted for gain and loss not recognized by § 510(e) of the Merchant Marine Act of 1936. 46 U.S.C. § 1160(e) (1958 ed.).

**3.** Of course no contention is advanced that the applicability of the Internal Revenue Code of 1954 to the tax year 1955 affects the issue in this case.

cant with the amount of charter hire which would have been paid for the use of any vessel exchanged on the original purchase. Paragraph (7) provides for a readjustment of the trade-in allowance for any vessel exchanged on the original purchase. Paragraph (8) is a detailed tax provision, the effect of which is to recompute the applicant's taxes by disallowing depreciation and amortization on the new vessel for the period prior to the Act; by treating charter hire returned to the Government under Paragraph (6) as never having been received as income; and by treating the interest and charter hire credited to the applicant under Pargraphs (5) and (6) as income in the taxable year of the Act.

■ It will thus be seen that the statute does not specifically state which figure is to be used as the applicant's cost basis for depreciation purposes. The plaintiff asserts that the statutory mandate stating "the amount of the adjustment shall be determined as follows" coupled with the ensuing eight paragraphs is a clear indication that all of those paragraphs must be applied to determine its cost basis. The Government argues that the statute was intended to put pre- and post-enactment purchasers on the same basis by establishing a uniform "statutory sales price" for the same class of vessels, and that the provisions of § 9 relied upon by the plaintiff were simply intended to effect an unwinding of the prior contract of sale.

An examination of the statutory scheme of § 9 together with a study of its legislative history convinces us that the position of the Government is sound. The genesis of the legislation is found in the Committee Reports of both the House and the Senate. H.R.Rep.No.831, 79th Cong., 1st Sess. 2–3 (1945), U.S.Code Cong.Serv., 79th Cong., 2d Sess., pp. 1086, 1087–1088 (1946); S.Rep.No.807, 79th Cong., 1st Sess. 1–2 (1945). These reveal a Congressional purpose to avoid the catastrophic economic conditions in the maritime industry which followed World War I when the United States disposed of its merchant vessels without prescribing the price at which they were to be sold. As a result prices declined severely, and those who had previously purchased vessels at higher prices faced bankruptcy. The method devised by Congress to avoid a recurrence of this situation after World War II was the establishment of a "statutory sales price" for each class of vessels. With regard to the plight of those who had purchased vessels at inflated prices prior to the enactment of the bill, the House Report states:

"These purchasers will suffer an unwarranted discrimination unless the price at which they purchased or agreed to purchase these vessels is adjusted to conform to the statutory sales price prescribed in the bill. There would be nothing more demoralizing to a floor price on war-built vessels than to fail to make this adjustment, even though it involves relatively large amounts of money. The effect of making the adjustment is the same as if the bill had been enacted at the beginning of the war period and all sales during the war period had been at the statutory sales price.

"The amount of the adjustment (sec. 9) in each case is first applied to reduce any mortgage indebtedness to the Commission on the vessel, and the balance, if any, is refunded to the purchaser.

"*As a condition to receiving an adjustment under this provision of the bill, the purchaser must agree to treat the sale for all purposes as if it had been made under the bill,* for the bill requires that the charter hire charged to the United States for bare-boat use of the vessel since the sale must be readjusted to an amount equal to 15 percent per annum of the readjusted price. * * * These counter adjustments in favor of the United States will of course substantially lessen the gross effect of readjusting the prior sales price down to the statutory sales price provided in the bill." (Em-

phasis supplied.) U.S.Code Cong. Serv., 79th Cong., 2d Sess., at 1097–1098 (1946). The Senate Report is to the same effect. S.Rep.No.807, 79th Cong., 1st Sess., at 19. Thus, the original bills in both the House and Senate clearly provided that the price to the pre-enactment purchaser would be the statutory sales price, but, as a condition to receiving this adjustment, counter adjustments in favor of the Government would be required.

Section 9 of the House bill was amended on the floor of that body by a committee amendment offered by Representative Jackson, chairman of the subcommittee which considered the revision. The debate on that amendment is enlightening. Before it was formally offered for consideration on the floor of the House, several committee members made statements which, like the statements in the Committee reports, indicated that pre-enactment purchasers were to be allowed an adjustment to the statutory sales price, but would be required to make counter adjustments in favor of the Government.[4] Mr. Jackson then submitted the following pellucid explanation of the Committee amendment:

"There has been a feeling that the amount of the adjustment provided for in section 9 of the bill as reported is too high. The committee amendment seeks to cut down the amount of this adjustment and at the same time to be perfectly fair to all concerned—those who bought before the enactment of the bill, those who bought after the enactment of the bill, and the United States.

"The committee amendment treats all of these prior sales as being

made on the date of the bill's enactment and not before that time, so that the previous purchaser and a future purchaser will be put on exactly the same basis. In order to accomplish this result it is necessary to "unwind" a previous transaction, and most of the provisions of the committee amendment which appear complicated are the provisions describing how this unwinding is to be done. [There follows a discussion of the eight paragraphs finally enacted into law.]

"These are the provisions which the amendment includes for the purpose of unwinding the previous transaction. The basic principle of the amendment is very simple—the previous transaction is to be looked upon as having taken place not when it actually did but as taking place on the date of the bill's enactment and subject to all of the bill's provisions. The amendment reduces the amount of the adjustment under section 9 substantially and is fair to all concerned." 91 Cong.Rec. at 9282 (1945).

The differences in the House and Senate bills were resolved by a Conference Committee of both houses. The relevant portion of the report of that Committee follows:

"*Adjustment of Prior Sales to Citizens*

\* \* \* \* \* \*

"Both the House bill and the Senate amendment provided for (1) adjustment of the original purchase price, (2) adjustment of the charter hire, (3) adjustment of trade-in allowances in connection with the prior original purchase, and

---

4. These statements appear at 91 Cong.Rec. 9182–9185 (1945) (remarks of Rep. Jackson); 9194 (digest of Rep. Bonner); 9196–7 (remarks of Rep. Hale); 9199 (remarks of Rep. McConnell). Typical of these comments were those of Rep. Hale:

"Then in section 9 of the bill we have provided that a citizen who has bought a war-built ship since December 31, 1940,

may readjust the transaction in such a way that it may be deemed to have occurred at the time of the enactment of this bill. That is to say, we scale down the price which he paid to the price which he would have paid under this bill, and make corresponding adjustments with respect to charter hire, depreciation, and so on. \* \* \*" 91 Cong.Rec. 9197.

(4) adjustments of taxes paid on account of ownership of the vessel.

"Under the House bill the owner would receive as an adjustment the difference between the statutory sales price of the vessel computed as of the date of enactment of the act and the price he originally paid for the vessel. The owner would return all charter hire previously received or allowed by the Government during his ownership of the vessel. The owner would be allowed 3½ percent interest on his original purchase price (but where there was a trade in, only on the difference between his original purchase price and the allowance under the trade in.) Under the House bill where the original purchase involved the trade in of an old vessel, the trade in allowance is adjusted in accordance with the trade in standards prescribed under section 8 of the House bill (top limit of 10 percent of the war cost). The owner would be allowed charter hire on the traded in vessel.

"Under the Senate amendment the owner would receive as an adjustment the difference between the original price (depreciated at 5 percent plus 3 or 4 percent war service) and the statutory sales price for the vessel determined as of the date of enactment of the measure. Under the Senate amendment the owner would return the difference between the charter hire he received from the Government while he owned the vessel and the charter hire he would have received had the price of the vessel been the adjusted price arrived at under the act. Under the Senate amendment the owner would receive credit for the interest he actually paid to the Government on the deferred account of his original purchase price. The Senate amendment also provides for an adjust-

ment of the trade in allowance for a vessel traded in on the original purchase, in accordance with section 8 of the Senate amendment (which prescribes a top limit of one-third of the unadjusted statutory sales price). Under the Senate amendment no provision is made for allowance for charter hire of the traded in vessel.

"The conference agreement restores the House provisions on the points stated in the two preceding paragraphs." Conf.Rep.No. 1526, 79th Cong., 2d Sess. 17 (1946).

We think that the foregoing legislative materials and statutory scheme clearly manifest a Congressional intention to effect a rescission of the prior contract of sale and an adjustment in price to the statutory sales price. Indeed, it would be difficult to find more perspicuous language to accomplish an "annulling or abrogation or unmaking of contract and the placing of the parties to it in status quo." Black's Law Dictionary, Fourth Ed., 1951, defining "Rescission of Contract." The necessary consequence of this view of the legislation is that the district court correctly determined the cost basis of the plaintiff.[5]

The plaintiff admits that the original bills in both houses of Congress equated the adjusted price to the statutory sales price. The plaintiff argues, however, that the amendment offered on the floor of the House and subsequently enacted into law rejected this approach in favor of the "formula theory" contained in the eight paragraphs of § 9. The flaw in this argument is that it is clearly based on a misreading of the legislative history. For, as we have seen, each of the original bills required additional adjustments in favor of the Government as a condition to receiving an adjustment in price. The purpose of the amendment was simply to provide a more equitable

5. This disposition makes it unnecessary for us to consider the alternative argument of the Government that interest, charter hire and taxes are not capital items and therefore are not includible in a computation of cost basis.

unwinding of the original contract of sale.[6]

The plaintiff relies on the legislative history of a subsequent bill considered by the Congress which would have provided the relief it now seeks. However, this bill failed of enactment when it was vetoed by President Truman. As the Supreme Court has stated in a similar situation, "If there is anything in these subsequent events at odds with our finding of the meaning of § 3, it would not supplant the contemporaneous intent of the Congress which enacted the Lucas Act." Fogarty v. United States, 340 U.S. 8, 13–14, 71 S.Ct. 5, 8, 95 L.Ed. 10 (1950).

In its brief the plaintiff asserts that three other Federal courts have held in its favor on this issue. Socony Mobil Oil Co. v. United States, 287 F.2d 910 (Ct.Cls.1961) [a consolidation of three cases]; Barber Oil Corp. v. Manning, 135 F.Supp. 451, (D.C.N.J.1955); and Waterman Steamship Corp. v. United States, 203 F.Supp. 915 (S.D.Ala.1962). Subsequent to the argument of this appeal, however, the decision in Waterman was reversed by the Fifth Circuit. United States v. Waterman Steamship Corp., 330 F.2d 128 (C.A.5, 1964). Thus, the rule in the Third and Fifth Circuits is opposed to the view of the Court of Claims.

■ In its amended answer to the plaintiff's complaint, the Government filed a non-tax counterclaim alleging that $15,575.12 in construction progress interest payments made by the plaintiff on two of the vessels in question were wrongfully credited to plaintiff under § 9 of the Act. In addition to requesting the return of that amount, the Government asserts that as these payments were erroneously included in the original purchase price, it is also entitled to a refund of the interest credited to the plaintiff under § 9(b) (5)—3½ per cent on the excess of original purchase price over trade-in allowance—to the extent allocable to the erroneous inclusion. The portion of the § 9(b) (5) credit is said to be $621.53.

The Government admits that the plaintiff paid the construction progress interest amounts to the Maritime Commission; that the original contract of sale between the plaintiff and the Commission specifically and unequivocally provided that these amounts were included in the purchase price of the vessels; that the Commission, charged with administering the Merchant Ship Sales Act of 1946, viewed them as a part of the purchase price; and, finally, that they were so treated in the § 9(b) adjustment agreements. Nor is it contended that the Act of 1946 directs the exclusion of these payments from the computation of purchase price. Rather, the argument is premised on the view that such payments were not a part of the purchase price of the vessels under the Merchant Marine Act of 1936, 46 U.S.C. §§ 1101–1246 (1958 ed.), which applied to the original sale. From this it is urged that Congress did not intend these payments to be included in the term "original purchase price" in § 9 of the Act of 1946.

The argument is at best tenuous, for, as the district court pointed out, "the relevance of the text of the 1936 statute is open to question since it is the 1946 Act that is being applied." 214 F.Supp. at 596, n. 52.[7] More important, we agree

6. The plaintiff also argues that under our view of the Act, it would have been in a better tax position had it not applied for an adjustment in price since its cost basis would then have been $6,602,366.17, or $1,494,570.15 more than the adjusted statutory sales price. The argument is that "assuming an effective tax rate of fifty per cent, the tax saving on the aforesaid amount taken as depreciation would

be $747,285.07," whereas the net adjustment was $489,366.89. However, the plaintiff was not obliged to apply for an adjustment in price and having done so under § 9, its cost basis was reduced to the adjusted statutory sales price.

7. The allegedly pertinent sections of the Act of 1936 are summarized in the opinion of the district court, 214 F.Supp. at

with the cogent analysis of the district court which rejected the contention that these payments were improperly included as a part of the original purchase price in the adjustment under § 9 of the Act of 1946. The two cases we have discovered which rule on the question have reached the same conclusion. United States v. Waterman Steamship Corp., 330 F.2d 128 (C.A.5, 1964); New York & Cuba Mail Steamship Co. v. United States, 145 Ct.Cl. 652, 172 F.Supp. 684 (Ct.Cls.1959).

In sum, we are in accord with the excellent, thorough opinion of the district court with regard to each of the issues raised on these appeals.

The judgment of the district court will be affirmed.

594. A study of them makes it far from clear that construction progress interest payments were precluded from being considered as a part of purchase price even under the 1936 Act.