*Decision will be entered under Rule 50.*

MOORE-MCCORMACK LINES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2887–62. Filed August 27, 1965.

*Paul Edgar Swartz, William E. Stockhausen,* and *Harold H. Meyers,* for the petitioner.

*George T. Rita,* for the respondent.

---

HOYT, *Judge:* Respondent determined a deficiency in income tax against petitioner in the amount of $663,519.48 for the taxable year 1957.

The issues for decision are:

(1) What was the cost basis, for purposes of computing the correct amount of gain on sale, of two ships acquired by petitioner in 1957 for cash and stock, and resold in the same year?

(2) Is the cost basis, for purposes of computing depreciation, of various vessels purchased in 1941 the original purchase price as readjusted under section 9 of the Merchant Ship Sales Act of 1946 or the "statutory sales price" as calculated under the Act?

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation and exhibits attached thereto are hereby incorporated by reference.

Petitioner is a Delaware corporation with its principal office in New York City. It keeps its books and files its income tax returns on the accrual basis. It filed its 1957 calendar year income tax return with the district director, Manhattan District. Petitioner is a publicly owned shipping company whose common stock is, and was at all times here pertinent, traded on the New York Stock Exchange.

*Facts Common to This Case and to Docket No. 3105–62,*
*Seas Shipping Co.*

On March 1, 1957, Moore-McCormack Lines, Inc. (hereinafter referred to as Mooremac), entered into a contract with Seas Shipping Co., Inc. (hereinafter sometimes referred to as Seas), which operated a shipping fleet known as the Robin Line. This contract provided for the purchase by Mooremac from Seas of 12 vessels for a total purchase price of $17 million, payable $3,200,000 in cash, $4,800,000 in cash or promissory notes at option of Mooremac, and $9 million by 300,000 shares of Mooremac's common stock. The vessels were described in the contract as follows:

| Name | Type | Year built |
|---|---|---|
| SS *Robin Locksley* | C–2S | 1941 |
| SS *Robin Wentley* | C–2S | 1941 |
| SS *Robin Tuxford* | C–2S | 1941 |
| SS *Robin Sherwood* | C–2S | 1941 |
| SS *Robin Kettering* | C–2S | 1941 |
| SS *Robin Doncaster* | C–2S | 1941 |
| SS *Robin Goodfellow* | C–3 | 1945 |
| SS *Robin Gray* | C–3 | 1943 |
| SS *Robin Hood* | C–3 | 1945 |
| SS *Robin Kirk* | C–3 | 1943 |
| SS *Robin Mowbray* | C–3 | 1943 |
| SS *Robin Trent* | C–3 | 1943 |

Pertinent provisions of the contract are set forth below:

5. Delivery of Vessels: Each Vessel shall be delivered to BUYER * * * promptly on completion of its voyage in progress on April 15, 1957. * * *

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

7. Purchase Price and Payment Thereof:

(a) As and for the purchase price of the Vessels, the BUYER shall pay and deliver to SELLER the following:

(1) Cash _____$3,200,000.

(2) Three Hundred Thousand (300,000) shares of BUYER's duly authorized Common Stock (par value $12 per share).

(3) At BUYER's option, cash or promissory notes of BUYER, as more particularly described hereinafter, in the amount of $4,800,000. By mutual agreement some or all of said sum of $4,800,000 may be paid in additional shares of BUYER's duly authorized Common Stock (par value $12 per share).

(b) The purchase price shall be payable as follows:

(1) On delivery of the *Robin Goodfellow*, there shall be paid in cash out of BUYER's Capital Reserve Fund the sum of $1,600,000 for such Vessel.

(2) On delivery of the *Robin Hood*, there shall be paid in cash out of BUYER's Capital Reserve Fund the sum of $1,600,000 for such Vessel.

(3) Upon delivery of the first of the Vessels to be delivered, BUYER will issue and deposit in escrow with The Chase Manhattan Bank, New York, New York * * * Three Hundred Thousand (300,000) shares of its duly authorized Common Stock. * * *

(4) Such escrow agreement shall, among other things, provide that on receipt by the Bank of notice from BUYER and SELLER jointly that one or more of the Vessels has been delivered by SELLER and accepted by BUYER, said Three Hundred Thousand (300,000) shares of Common Stock shall be delivered by the Bank to SELLER or upon its written order in payment for the Vessels of the C–2S type unless excepted as provided in Article 10 hereof, upon delivery thereof, and, to the extent that such shares shall not be deliverable in payment for Vessels of the C–2S type as hereinabove provided, in payment for Vessels of the C–3 type (except the *Robin Hood* and the *Robin Goodfellow*) in the order of their delivery.

(5) For purposes of paragraph (4) above, said Three Hundred Thousand (300,000) shares of Common Stock shall be delivered to SELLER or on its written order at the rate of one full share thereof for each $30, or fraction thereof, of value of the Vessels hereinafter set forth opposite their respective names, as follows:

| Name of vessel | Value |
| --- | --- |
| SS *Robin Locksley* | $1,266,667 |
| " *Wentley* | 1,266,677 |
| " *Tuxford* | 1,266,667 |
| " *Sherwood* | 1,266,667 |
| " *Kettering* | 1,266,666 |
| " *Doncaster* | 1,266,666 |
| " *Gray* | 1,550,000 |
| " *Kirk* | 1,550,000 |
| " *Mowbray* | 1,550,000 |
| " *Trent* | 1,550,000 |

[13,800,000]

(6) Subject to the final sentence of paragraph (a)(3) of this Article 7, the balance of the purchase price of the Vessels shall be payable, at BUYER's option, either in cash or in serial promissory notes of BUYER, or partly in cash and partly in such notes. * * *

*      *      *      *      *      *      *

8. Conditions to Sale: Anything herein to the contrary notwithstanding the purchase herein provided for is and shall be subject to full compliance on or before April 15, 1957 with the following conditions precedent:

(a) Approval by the Federal Maritime Board and/or Maritime Administration of the sale of the Vessels on the terms and conditions herein contained;

*      *      *      *      *      *      *

(g) * * * [T]he listing by the New York Stock Exchange of the Three Hundred Thousand (300,000) shares of such Common Stock issuable in payment of part of the purchase price as herein provided;

*      *      *      *      *      *      *

10. Exception of Vessels from Sale: At the option of BUYER, exercisable by written notice delivered to SELLER prior to delivery of the first Vessel hereunder, there shall be excepted from the purchase herein provided for the SS *Robin Kettering* or the SS *Robin Doncaster*, or both. In such event, any such Vessel so designated shall be excluded from the sale herein provided for, and the cash or promissory notes of BUYER payable as provided in Article 7(a)(3) hereof shall be reduced by $1,266,666 for each Vessel so excluded.

*      *      *      *      .      *      *      *

12. Purchase for Investment: SELLER represents, warrants and covenants that it is acquiring the shares of Common Stock of BUYER solely for investment and not with a view to the resale or further distribution thereof.

13. Force Majeure: (a) * * *

(b) In the event, after delivery of any one of the Vessels, SELLER shall be unable to deliver, or BUYER shall be unable to accept delivery of, one or more of the Vessels due to restraints of governments, principalities, nations or the United Nations, or other reasons that may be brought about by causes beyond the reasonable control of either party, this Agreement shall not terminate, but the purchase price of the Vessels shall be reduced by the value of the Vessel or Vessels not delivered. For the purpose of this paragraph, the SS *Robin Hood* and SS *Robin Goodfellow* shall be deemed to have a value of $1,600,000 and the other Vessels shall be deemed to have the values set opposite their respective names in Article 7(b)(5) hereof. Such reduction of purchase price shall, with respect to the non-delivery of the SS *Robin Hood* and/or SS *Robin Goodfellow*, be applied to reduction of the cash amounts payable as provided in Articles 7(b)(1) and 7(b)(2) hereof and, with respect to the non-delivery of any of the other Vessels, shall be applied first in reduction of the cash or promissory notes set forth in Article 7(a)(3) hereof and then in reduction of the shares of Common Stock set forth in 7(a)(2) hereof.

On March 1, 1957, contemporaneously with the execution of the above-described contract of sale, Seas entered into a stockholders' agreement with certain principal stockholders of Mooremac under which it was agreed that the parties to the agreement would vote their stock to elect directors, two of whom were to be nominated by Seas and the remaining seven by a majority of the parties to the agreement. This agreement was to continue in effect for 5 years or until Seas

ceased to own beneficially at least 100,000 shares of Mooremac's stock, whichever event first occurred.

Also on March 1, 1957, contemporaneously with the agreement of sale and the stockholders' agreement, Mooremac entered into a "memorandum of understanding" with Seas which provided, *inter alia*, that Mooremac would continue to employ certain key men of Seas. Mooremac, however, was not required to employ these persons for any specific length of time. The memorandum of understanding also required that Mooremac continue to use the name "Robin Line" for a period of 5 years on the ships purchased. It was agreed that the contract of sale and the stockholders' agreement as well as the memorandum of understanding would be considered as interrelated and complementary one to another.

On March 11, 1957, both parties submitted the contract of sale to the Federal Maritime Board for approval, as required by law. On April 25, 1957, the Federal Maritime Board notified the parties of its approval. In this notice of approval some of the principal terms of the contract were recited. Among the terms so recited was the designated dollar selling price for each ship and the provision for partial payment in shares at a designated rate of $30 per share. As required by its terms, both Mooremac and Seas filed their unqualified acceptance of the Federal Maritime Board's order of approval, on April 30, 1957.

Under article 10 of the contract of sale, as quoted above, Mooremac had the right to exclude two ships, the *Robin Kettering* and the *Robin Doncaster* from the transaction. On April 11, 1957, Mooremac exercised its option to exclude both vessels from the purchase. Thereafter, Seas sold these two ships, which had been ascribed values in the contract of sale to Mooremac of $1,266,666 each, to unrelated third parties for $1,350,000 each.

On May 1, 1957, Mooremac, Seas Shipping, and the Chase Manhattan Bank entered into the escrow agreement referred to in the vessel purchase agreement and Mooremac deposited with Chase Manhattan 300,000 shares of its common stock in the name of Seas Shipping. The escrow agreement provided, *inter alia*, as follows:

2. Disposition of Stock.—

2.01 Subject to the provisions of Section 2.04, the Escrow Agent shall deliver to The Chase Manhattan Bank, Corporate Trust Department, Transfer Agent, and to Chemical Corn Exchange Bank, Registrar, for countersignature and registration, respectively, and thereafter to the Seller, or upon its written order, in payment on account of the purchase price of the following Vessels to be pur-

chased by Buyer, the number of shares of Stock set opposite their respective names:

| Name of vessel | Number of shares |
|---|---|
| SS *Robin Wentley* | 28,667 |
| *Robin Locksley* | 42,223 |
| *Robin Tuxford* | 42,223 |
| *Robin Sherwood* | 42,223 |
| *Robin Trent* | 51,666 |
| *Robin Mowbray* | 51,666 |
| *Robin Gray* | 20,666 |
| *Robin Kirk* | 20,666 |

2.02  In the event that the Seller shall be unable to deliver, or the Buyer shall be unable to accept delivery of, one or more of the Vessels specified in Section 2.01 hereof and the Buyer and the Seller, jointly, shall notify the Escrow Agent to that effect, then, and in any such event, the shares of Stock otherwise deliverable in payment on account of the purchase price of the Vessel or Vessels not so delivered and accepted shall, subject to the provisions of Section 2.04, be disposed of by the Escrow Agent as follows:

A.  By delivery to the Seller, or upon its written order, in payment first on account of the purchase price of the SS *Robin Wentley*, if not then yet delivered, of 13,556 additional such shares and then on account of the purchase price of the SS *Robin Kirk* and/or SS *Robin Gray*, if either or both of said Vessels shall not then yet have been delivered, of up to 31,000 additional such shares for each such Vessel; or

B.  To the extent that such shares are not applied on account of the purchase price of Vessels thereafter delivered, by delivery to the Seller, or upon its written order, in prepayment on account of the principal of any notes theretofore delivered, in accordance with the Purchase Agreement, by the Buyer to the Seller on account of the purchase price of any Vessel, such prepayment to be at the rate of $30 for each share of Stock so delivered.

2.03  The balance of any shares of Stock held by the Escrow Agent, after application thereof as provided in Sections 2.01 and 2.02, shall be delivered by the Escrow Agent to the Buyer, or upon its written order.

2.04  The Buyer and the Seller, jointly, shall notify the Escrow Agent from time to time as and when Vessels shall be delivered by the Seller and accepted by the Buyer, and, promptly upon receipt of such notice, the Escrow Agent shall deliver the shares of Stock deliverable pursuant to Section 2.01 or clause A of Section 2.02 on account of the purchase price of the Vessel specified in such notice.  The Buyer and the Seller, jointly, shall instruct the Escrow Agent from time to time as to dispositions, if any, of the Stock to be made pursuant to clause B of Section 2.02 or Section 2.03, and promptly upon receipt of any such instructions, the Escrow Agent shall deliver to the Seller, or the Buyer, as the case may be, or upon their respective written orders, the shares of Stock deliverable pursuant to said Sections.  The Buyer and the Seller shall deliver to the Escrow Agent all documents necessary to effect delivery of any Shares deliverable hereunder.

Pursuant to the aforesaid contract of sale and the escrow agreement, the ships subject to the contract (other than the two ships excluded as mentioned above) were delivered by Seas and paid for by Mooremac as follows:

| Ship | Date of delivery | Cash | Notes | Shares of stock |
|---|---|---|---|---|
| | *1957* | | | |
| SS *Robin Goodfellow* | June 5 | $1,600,000 | | |
| SS *Robin Gray* | June 14 | | $930,000 | 20,666 |
| SS *Robin Hood* | June 18 | 1,600,000 | | |
| SS *Robin Kirk* | July 31 | | 930,000 | 20,666 |
| SS *Robin Locksley* | June 24 | | | 42,223 |
| SS *Robin Mowbray* | May 17 | | | 51,666 |
| SS *Robin Sherwood* | May 27 | | | 42,223 |
| SS *Robin Trent* | May 3 | | | 51,666 |
| SS *Robin Tuxford* | June 25 | | | 42,223 |
| SS *Robin Wentley* | Aug. 9 | 406,668 | | 28,667 |
| Totals | | 3,606,668 | 1,860,000 | 300,000 |

Pursuant to contracts made in April of 1957, Mooremac resold the SS *Robin Tuxford* and the SS *Robin Wentley* to unrelated third parties for $1,350,000 each. These ships were sister ships and also were sister ships to the *Doncaster* and *Kettering* sold about the same time by Seas for the same price.

The 300,000 shares of stock issued to Seas under the contract of sale made Seas the largest single stockholder of Mooremac; as of the end of 1957 this amounted to approximately 13 percent of Mooremac's outstanding stock. During 1957 Mooremac's chairman of the board, Emmet J. McCormack, held 212,360 shares and this was the second largest shareholding. There were 140,000 shares held by Dollar Associates, Inc. Seas acquired its stock as an investment and at the time of trial in the instant case continued to hold the 300,000 shares received on the sale of its vessels to Mooremac.

The book value of Moremac's stock was $39.13 as of December 31, 1956, and $39.15 as of December 31, 1957.

Mooremac stock was traded on the New York Stock Exchange at a small volume during the period from March 1, 1957, to August 9, 1957, and at an average of 387 shares per day on the 8 days on which ships were delivered to Mooremac in exchange for stock. There was only slight fluctuation in the average selling price as indicated by the following table:

| Date or period | High selling price | Low selling price | Average (mean) selling price | Number of shares traded |
|---|---|---|---|---|
| *1957* | | | | |
| March | 23⅞ | 21⅝ | 22.75 | 12,100 |
| May 3 | 23½ | 23½ | 23.5 | 300 |
| May 17 | 23⅞ | 23¾ | 23.8125 | 500 |
| May 27 | 22¾ | 22⅝ | 22.6875 | 300 |
| June 14 | 22¼ | 22¼ | 22.25 | 100 |
| June 24 | 22¼ | 22⅛ | 22.1875 | 300 |
| June 25 | 22¼ | 22¼ | 22.25 | 100 |
| July 31 | 22¾ | 22⅜ | 22.5625 | 1,200 |
| Aug. 9 | 22½ | 22 | 22.25 | 300 |

During the year 1957 a total of 166,000 shares of Mooremac stock was traded on 237 of the 252 trading days on the New York Stock Exchange. The highest price at which Mooremac stock has been traded

on the New York Stock Exchange to date of trial was 25¼ in January and February 1957.

### Other Facts Related to the Purchase of Ships From Seas Shipping Co.

Shortly after the contract of sale was entered into, Mooremac, on April 15, 1957, made application to the New York Stock Exchange for listing of the 300,000 new shares of its common stock to be issued to Seas. In this application the following statement was made:

> The vessels will be charged at cost to fixed assets. The Common Stock issuable pursuant to the Agreement will be capitalized at $30 per share, deemed to be the fair market value thereof.

The application for listing was approved and the shares were listed.

In the letter of April 11, 1957, addressed to Seas Shipping in which Mooremac exercised its option to exclude the *Robin Kettering* and the *Robin Doncaster* from the transaction the concluding sentence was as follows:

> In accordance with the terms of such Purchase and Sale Agreement, the purchase price for the remaining vessels to be purchased by us is, therefore, reduced by the aggregate sum of $2,533,332 to $14,466,668.

The purchase of the 10 vessels from Seas was recorded on Mooremac's books at $14,466,668. Mooremac's 1957 annual report contained financial statements audited by Arthur Anderson & Co. One of the notes to the financial statements contains the following:

> In addition, the Company acquired four C–2 type and six C–3 type cargo vessels from the Seas Shipping Company, Inc., for a total purchase price of $14,467,000. Of the amount paid $9,000,000 was represented by the issuance of 300,000 shares of the Company's common stock and the balance by cash and first preferred ship mortgages. Two of the C–2 type cargo vessels which represented aggregate cost of $2,533,000 were subsequently sold resulting in a profit of approximately $54,000 net of Federal income taxes.

Including the sale by Seas of the *Doncaster* and the *Kettering*, at least nine ships similar to those purchased by Mooremac from Seas changed hands in the open market at about the same time as the sale to Mooremac and at comparable prices. Three C–2 type vessels were purchased by the Grace Line, one for $1,350,000 and the other two for $1,335,000 each (for future delivery). Four C–3 type vessels were purchased by Mooremac from Pacific Argentina Brazil Line, Inc., an unrelated corporation, for $1,625,000 each. The names of these ships, the year built, and the date of delivery are as follows:

| Original name | New name | Year built | Date of delivery |
|---|---|---|---|
| | | | *1957* |
| Pathfinder | Mormacsun | 1943 | Feb. 14 |
| Forester | Mormacwave | 1944 | Mar. 20 |
| Trader | Mormacguide | 1944 | Apr. 4 |
| Seafarer | Mormacwind | 1944 | Apr. 25 |

The purchase price of $1,625,000 each was paid in cash and was from $25,000 to $75,000 in excess of the stated contract price for comparable vessels purchased from Seas.

The two sales which give rise to the issue presented here are the sale by petitioner of the *Robin Tuxford* and the *Robin Wentley* to wholly unrelated corporations. These sales were both made under contracts entered into on April 30, 1957, which provided for closing of the transactions when the ships were delivered to Mooremac by Seas Shipping. The *Tuxford* sale was consummated on June 25, 1957, the same day that Seas delivered that vessel to petitioner, and petitioner incurred deductible expenses in connection with that sale of $32,046.35. The sale of *Wentley* was consummated on August 9, 1957, the same day that Seas delivered that vessel to petitioner, and petitioner incurred deductible expenses in connection with that sale in the amount of $35,634.36. As indicated above, the Mooremac-Seas contract price for *Wentley* and *Tuxford* was $1,266,667 each; sale of the *Tuxford* was accomplished by delivery to Seas of 42,223 shares of Mooremac stock, and petitioner paid $406,668 in cash and 28,667 shares of stock for *Wentley*. The fair market value of the *Tuxford* and *Wentley* transferred to petitioner by Seas Shipping in exchange for cash and shares of petitioner's stock was at least $1,266,667 for each vessel.

In its income tax return for 1957, petitioner reported these sales of the two vessels as short-term capital gains as follows:

| Description | Date acquired and date sold | Gross sales price | Cost or other basis | Expense of sale | Gain |
|---|---|---|---|---|---|
| Vessels: | | | | | |
| Robin Tuxford | Apr. 30, 1957 | $1,350,000 | $1,266,667 | $32,046.35 | $51,286.65 |
| Robin Wentley | do | 1,350,000 | 1,266,667 | 35,634.36 | 47,698.64 |

Respondent, in his deficiency notice, determined that the short-term gain realized on these sales was $1,374,984.29 computed as follows:

| | Robin Wentley | Robin Tuxford | Total |
|---|---|---|---|
| Selling price of vessels | $1,350,000.00 | $1,350,000.00 | $2,700,000.00 |
| Less: Expense of sale | 35,634.36 | 32,046.35 | 67,680.71 |
| Net selling price | 1,314,365.64 | 1,317,953.65 | 2,632,319.29 |
| Cost basis of vessels: | | | |
| Cash | 406,668.00 | ------------- | 406,668.00 |
| Common stock: | | | |
| 28,666 19/30 shares at $12 | 344,000.00 | ------------- | 344,000.00 |
| 42,222 7/30 shares at $12 | ------------- | 506,667.00 | 506,667.00 |
| Total cost basis | 750,668.00 | 506,667.00 | 1,257,335.00 |
| Gain realized | 563,697.64 | 811,286.65 | 1,374,984.29 |

No explanation for the $12 per share valuation ascribed to Mooremac's stock by the respondent is made but it apparently derives from the fact that the stock has a $12 par.

### FINDINGS OF ULTIMATE FACT

The stock transferred by Mooremac to Seas as part of the purchase price of these ships had a fair market value of $30 per share.

### Facts Relating to Basis of Ships Purchased in 1941 From the U.S. Maritime Commission

In the year 1941 petitioner entered into purchase contracts with the U.S. Maritime Commission for the purchase of six vessels then owned by the United States. The total purchase price of the six vessels was $8,284,330.24.[1]

Upon delivery of certain of the vessels to the petitioner, they were chartered by the Government, for which the Government paid charter hire. On its Federal income tax returns for the years in which the charter hire was paid, petitioner reported the charter hire as income and deducted depreciation for the vessels.

On March 8, 1946, Congress enacted the Merchant Ship Sales Act of 1946, 60 Stat. 41, as amended, 50 U.S.C. App. sec. 1735 et seq. (1958 ed.), hereinafter sometimes referred to as the Act, which gave American citizens the right to purchase war-built ships from the United States at statutory sales prices which were substantially below the prices at which such vessels were sold by the Commission during the war. Section 9 of the Act, 50 U.S.C. App. sec. 1742 (1958 ed.), provided the opportunity, upon application, for those, like petitioner, who had bought ships during the war years to obtain a downward adjustment in their sales price "by treating the vessel as if it were being sold to the applicant on the date of the enactment of this Act [Mar. 8, 1946], and not before that time." The details of a section 9 adjustment are complex. They consist, however, essentially of two parts: (1) An adjustment in the purchase price down to the new statutory price (sec. 9(b)(1)–(4)); and (2) an unwinding of the transactions, including tax payments, that occurred as a result of the sale prior to 1946 (sec. 9(b)(5)–(8)).

Petitioner filed application under section 9 of the Act for an adjustment with respect to certain vessels purchased in 1941, including the following:

---

[1] The total purchase price consisted of a cash payment and a mortgage indebtedness. For simplicity in this opinion, the $8,284,330.24 purchase price will be considered as if it had all been paid in cash. See Waterman Steamship Corporation v. United States, 381 U.S. 252 fn. 1 (1965).

| Name | Date of delivery |
|---|---|
| *Mormacreed* | Feb. 9, 1943 |
| *Mormaclark* | Feb. 4, 1943 |
| *Mormactern* | Dec. 29, 1942 |
| *Mormachawk* | Dec. 14, 1942 |
| *Mormacwren* | Dec. 26, 1942 |
| *Mormacdove* | Dec. 31, 1942 |

The Maritime Commission granted such an adjustment in 1952, determining that under the statute the sales price of these vessels should be $5,522,376. Petitioner therefore was credited with $2,761,954.24, the difference between the statutory sales price and the original price of $8,284,330.24.

The pre-Act transactions were then unwound pursuant to the statute, as follows: (1) The Government was credited $3,381,697.02, representing the charter hire which had been paid by the Government to petitioner for use of the vessels prior to 1946; (2) the Government was debited $916,621.87, representing interest income which petitioner could have earned on the cash invested in the vessels prior to the date of the Act had this cash not been so committed; and (3) the Government was debited $1,286,110.84, representing an overpayment by petitioner of Federal income taxes, which under the Act, were recalculated to give effect to the foregoing unwinding. The sum of the unwinding debits and credits was a net credit in favor of the Government of $1,178,964.31. This amount reduced petitioner's credit on the original sales price of $8,284,330.24 from $2,761,954.24 to $1,582,989.93.

In tabular form, the computations and credits made under the Act were as follows:

STATUTORY ADJUSTMENTS

1. Original sales price _____ $8,284,330.24
2. Statutory sales price _____ 5,522,376.00

3. Gross sales price adjustment (sec. 9(b)(1)–
   (4)) _____ $2,761,954.24
4. Credits to Government:
5. Charter hire on vessels (sec. 9(b)(6)) _____ 3,381,697.02
6. Debits against Government:
7. Interest on petitioner's investment (sec.
   9(b)(5)) _____ 916,621.87
8. Overpayment by petitioner of Federal income
   taxes (sec. 9(b)(8)) _____ 1,286,110.84
9. Net credit in favor of Government (line 5
   minus lines 7 and 8) _____ 1,178,964.31

10. Net 1946 sales price adjustment (line 3 minus
    line 9) _____ 1,582,989.93

Petitioner claimed depreciation on the ships here involved [2] in its 1957 income tax return on the basis that their cost after readjustment was $6,701,340.31. The respondent allowed depreciation on the basis of the statutory sales price (as determined under sec. 9 of the Act) of $5,522,376. As a result thereof the depreciation deduction with respect to these vessels in the sum of $70,015.46 for the year 1957 was disallowed.

OPINION

The first issue in this case concerns petitioner's basis in the two ships SS *Robin Tuxford* and SS *Robin Wentley* which were purchased and resold in the year 1957. Under section 1011 of the Internal Revenue Code of 1954, the adjusted basis for determining gain or loss on the sale of property is the basis determined under section 1012 (as adjusted under sec. 1016 for depreciation, etc.). Section 1012 provides: "The basis of property shall be the cost of such property." Section 1.1012–1 of the regulations provides: "In general, the basis of property is the cost thereof. The cost is the amount paid for such property in cash or other property." In the instant case, to determine the amount paid for the ships in dollars, it is necessary to determine the value in dollars of the shares of stock given in payment.

In its 1957 income tax return, petitioner reported short-term gain on the sale of these two ships in the total amount of $98,985.29. This gain was computed on a cost of $1,266,667 for each ship, which was the designated value in the contract of purchase from Seas and which was based on a value of $30 per share for the stock issued in payment, plus the cash paid.

Seas Shipping Co., in reporting its gain on the 1957 sale of ships to petitioner, valued the petitioner's stock received in payment at only $19.90 per share. This valuation was also challenged by the Commissioner, who in that instance determined that the value of the stock was $39.17 per share, and Seas is contesting his action in a separate case in this Court—docket No. 3105–62. Respondent has taken a protective position between the two parties and in his briefs in the instant case, as well as in docket No. 3105–62, he restates the arguments of both Moore-McCormack and Seas Shipping and argues his own position that the value of the stock given in payment for the ships was $22.81 per share, based on trading prices on the New York Stock Exchange. Respondent's ultimate request is that whatever we deter-

---

[2] Actually three of the above-described ships purchased in 1941 were exchanged pursuant to sec. 8(d) of the Merchant Ship Sales Act prior to the tax year here in question, for three other vessels of a like kind which were similarly held for productive use in the business of petitioner. However, the adjusted basis of each old vessel carried over to the vessel received therefor and petitioner continued to deduct depreciation on the new vessel on such adjusted basis. Hence, this exchange has no effect on the legal issues here involved.

mine the value to be we should find the *same* valuation for the stock in both cases.

Since the record here indicates that the petitioner and Seas, both knowledgeable and experienced ship operating companies, were dealing at arm's length in the transaction here involved, it is entirely logical to presume that the value of the stock and cash given up by petitioner was equal to the value of the ships received. *Philadelphia Park Amusement Co.* v. *United States*, 126 F. Supp. 184 (Ct. Cl. 1954). Therefore, even though there is available in this case direct evidence of prices at which the previously outstanding shares of petitioner were traded in small volume on the stock exchange, which evidence might permit a determination of the value of the shares issued in payment for the ships without any reference to the values of the ships received, obviously, evidence of the value of the ships received is of great importance in determining the value of the stock exchanged. *Amerex Holding Corporation*, 37 B.T.A. 1169 (1938), affirmed per curiam 117 F. 2d 1009 (C.A. 2, 1941), certiorari denied 314 U.S. 620; Rev. Rul. 55–443, 1955–2 C.B. 562, 565.

In *Amerex Holding Corporation*, *supra* at 1190, we observed:

If therefore it appears from the record that the value of the property received, upon the issuance by a corporation of certain of its shares of stock, is the best evidence of the fair market value of those shares at the time of issue, that evidence should be applied and the fair market value of the shares of stock issued determined accordingly, even though at the time of issuance the corporation already owned substantial property of value and had other shares of stock outstanding.

In the written contract of sale each of the ships is assigned a dollar value. We are certainly well aware and mindful that the agreement of the parties fixing or allocating value of assets to be sold or exchanged is not controlling as a determination by which we are bound in determining the tax consequences. *Meister* v. *Commissioner*, 302 F. 2d 54 (C.A. 2, 1962), affirming a Memorandum Opinion of this Court. There is nothing in the record here, however, to indicate that the values so assigned for purposes of the contract were other than the actual fair market values of the ships recognized as such by the parties. In fact, there is an abundance of evidence which makes it apparent that the ships were in fact worth the amounts specified in the contract, if not more.

One of petitioner's witnesses was a shipbroker of considerable experience who had acted as broker in the sale by Seas of the *Robin Doncaster* and the *Robin Kettering* to third parties after petitioner had exercised its option to exclude those two ships from its contract of purchase, and also in the sale of the sister ships *Robin Tuxford* and *Robin Wentley* to third parties in 1957. This broker, who was thoroughly familiar with the ships sold by Seas to petitioner, testified that

at the time of the sales of the *Tuxford* and the *Wentley* to petitioner, these ships were worth not less than the $1,266,667 specified for each of them in the contract.

The correctness of the value specified in the contract is further supported by the fact that several other vessels of comparable types to those sold to petitioner changed hands in the open market, at approximately the same time as the sales to petitioner, at prices which were very closely comparable to the values placed on the Robin Line ships in the contract of sale to petitioner. In fact, the two ships omitted at petitioner's option from the contract were sold very shortly thereafter by Seas to third parties at prices in excess of the values assigned to them in the contract with petitioner, and the two ships, the bases of which are in dispute in this case (the *Tuxford* and the *Wentley*) were resold by petitioner on the same day they were received, for prices in excess of the values assigned in the purchase contract.

Finally, strong evidence that the parties regarded values assigned in the contract as the true fair market value of the ships is found in the provisions of articles 10 and 13 of the contract itself. These articles provide for possible elimination of ships from the group being sold, under certain circumstances. If such an elimination occurs the assigned value of the ship eliminated is applied to reduce the cash and notes to be paid under the contract. Thus, if a ship assigned a value of $1,266,667 is not delivered, and is eliminated from the transaction, the cash and promissory notes to be received by Seas from the entire contract is reduced by $1,266,667 as the true value of the eliminated ship. This is exactly what transpired when Mooremac exercised its option under section 10 and notified Seas at the same time that accordingly the purchase price for the remaining vessels "is, therefore, reduced by the aggregate sum of $2,533,332 to $14,-466,668." The reduction thus effected was all in the cash and notes so that the total paid by Mooremac by cash and notes was only $2,666,-668 instead of $4,800,000 specified by the contract. Since all of the ships were subject to possible elimination from the contract under article 13 (the "Force Majeure" clause) with a resulting diminution of the *cash* and notes to their entire extent, the values specified in the contract indicate the true fair values of the ships.

We hold that the ships purchased by petitioner from Seas were worth no less at the time of purchase than the values assigned to those ships in the contract of sale executed by petitioner and Seas. Though of basic importance, the value of the ships received is not conclusive evidence of the value of the stock issued in exchange therefor in a situation where the market price of previously outstanding stock of the issuer trading on a stock exchange is available as direct evidence of the value of the stock itself. *Pierce Oil Corporation*, 32 B.T.A. 403 (1935); Rev. Rul. 56–100, 1956–1 C.B. 624.

Petitioner's stock is traded on the New York Stock Exchange. Stock market quotations have been held to be the best evidence of value of a traded stock in a great number of cases. See, e.g., *W. T. Grant Co.* v. *Duggan*, 94 F. 2d 859 (C.A. 2, 1938) ; *Hazeltine Corporation* v. *Commissioner*, 89 F. 2d 513 (C.A. 3, 1937), affirming 32 B.T.A. 4 (1935) ; *Union National Bank of Pittsburgh* v. *Driscoll*, 32 F. Supp. 661 (W.D. Pa. 1940).

The weighted average price at which petitioner's stock traded on the New York Stock Exchange on the dates of delivery of each of the ships purchased was $22.81. It is respondent's contention that $22.81 is the appropriate per share valuation of the stock issued by petitioner to Seas in exchange for the ships purchased. While we are quick to recognize the persuasive importance of stock exchange prices in a stock valuation case such as the instant one, nonetheless, we are convinced that we must carefully consider all of the evidence in the record which indicates the true fair market value for the 300,000 shares here involved. See *Heiner* v. *Crosby*, 24 F. 2d 191 (C.A. 3, 1928), in which the court stated, at page 193 :

Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value. The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair market price or value, nor serve as the basis on which to determine the amount of gain derived from the sale.

Similarly, sales in 100-share lots under ordinary circumstances on a stock exchange may not serve as a reliable yardstick or measure of value in the very extraordinary circumstance of the issuance of 300,000 shares representing over 13 percent of the outstanding stock of a corporation and almost twice as many shares as were traded in the entire year of issuance. See *Maytag* v. *Commissioner*, 187 F. 2d 962 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court; accord, *Safe Deposit & Trust Co. of Baltimore*, 35 B.T.A. 259 (1937), affd. 95 F. 2d 806, 812 (C.A. 4, 1938) ; *James Couzens*, 11 B.T.A. 1040, 1161 (1928).

Of paramount importance in our rejection of the mean stock market trading price as determinative of value here is the fact that what we are called upon to value is not a few hundred or even a few thousand isolated shares which can be easily valued by a determination of how much cash they could be readily converted into in the established market. Rather, we must value a lump, a block, an integrated package or bundle of rights representing ownership of 13 percent of a large and successful corporation. We must think not in terms of 300,000 individual shares of stock at so many dollars per share, but in terms of the overall dollar value of ownership of 13 percent of Moore-McCor-

mack Lines, Inc., with the shares of stock meaningful not as something which can be converted to cash but merely as the formal evidence of ownership of the 13 percent. Cf. *Heiner* v. *Crosby, supra;* accord, *Perlman* v. *Feldmann*, 219 F. 2d 173 (C.A. 2, 1955), certiorari denied 349 U.S. 952 (1955).

The shares which were received by Seas were received with certain additional rights and privileges which did not attach to the shares which changed hands on the stock exchange. The 300,000-share block received by Seas carried with it a promise by petitioner to continue to operate the Robin Line and to employ certain of Seas' key men "in positions carrying responsibility and compensation comparable to that which they have enjoyed * * * in the employ of [Seas]." It also carried the guarantee of petitioner's controlling shareholders that the 300,000 shares in the hands of Seas would control two seats on the board of directors for at least 5 years. These rights had some value above and beyond the value of the stock alone, as reflected in stock exchange prices, absent such collateral rights, and, hence, the mean stock exchange price is not determinative of the overall value of the 300,000 shares coupled with the bundle of collateral rights involved in this case. In the circumstances it is not unreasonable that the size of the block involved plus the collateral rights received in the transaction resulted in a per share value over $7 in excess of the weighted average stock exchange price of $22.81.

We note further that the volume of trading in Mooremac stock on the New York Stock Exchange at the time in question was very light. In May 9,000 shares were traded; in June 5,800 shares; in July 15,500 shares; and in August 11,100 shares. Only 166,000 shares changed hands in all of 1957. This lightness in the volume of the trading which was at an average price of $22.81 per share somewhat dilutes the persuasiveness of that average per share price as reliable evidence of the value of a block of 300,000 shares.

When a block of stock as large as 13 percent is purchased the net asset value (or book value) of the stock becomes an important consideration. The book value of petitioner's stock at the time of purchase of the ships was in excess of $39 per share. This fact further supports petitioner's contention that the $22.81 mean stock market price is too low to be regarded as the per share value of the 300,000 shares here involved. Each of the 300,000 shares issued to Seas was backed by net assets worth more than $39.

To hold that the stock issued to Seas was worth only $22.81 per share would produce an anomalous situation. The purchase price specified in the contract of $1,266,667 for the *Tuxford* was paid by the issuance of 42,223 shares of stock, and the same purchase price for the *Wentley* was paid by the issuance of 28,667 shares of stock plus $406,668 in cash. If the stock were valued, as the respondent suggests,

at only $22.81 per share instead of $30, as petitioner valued it, the cost of the *Tuxford* would be $963,106 while the cost of the *Wentley* would be $1,060,562. This disparity is unrealistic in view of the fact that the two ships were sister ships of the same type, built at the same time, were assigned equal values in the contract of sale to petitioner, and were sold immediately upon delivery for equal amounts by petitioner.

Finally, the evidence is plentiful that both parties in their dealings with third parties and stockholders gave every indication that they regarded the stock as worth $30 per share. Both parties submitted the contract for approval to the Federal Maritime Board and accepted the Board's approval which contained a recitation of the provisions that shares of petitioner were to be accepted in payment at a rate of. $30 per share.

The Board's approval, accepted unconditionally by both petitioner and Seas Shipping, authorized Seas to sell and Mooremac to purchase the 10 vessels "to be paid for by Moore-Mac" as follows:

1. SSs *Robin Goodfellow* and *Robin Hood* in cash to be withdrawn from Moore-Mac's capital reserve fund_____ $3, 200, 000
2. SSs *Robin Tuxford* and *Robin Locksley* at $1,266,667 each:
    Mortgage to Seas_____ $2, 266, 669
    8888.8 shares common stock at $30 per share___ 266, 665
    _____
    2, 533, 334
3. The following vessels with 291,111.2 shares of common stock to be issued to Seas at $30 per share:
    SS *Robin Sherwood*_____ 1, 266, 667
    SS *Robin Wentley*_____ 1, 266, 668
    SS *Robin Gray*_____ 1, 550, 000
    SS *Robin Kirk*_____ 1, 550, 000
    SS *Robin Mowbray*_____ 1, 550, 000
    SS *Robin Trent*_____ 1, 550, 000
    _____
    8, 733, 335
    _____
    Total_____ 14, 460, 669

That both petitioner and Seas Shipping recognized that the total contract price for the 10 vessels was $14,466,668[9] is apparent from their unqualified acceptance of all of the provisions contained in the Maritime Board's authorizing letter of approval of the sale dated April 25, 1957. The total approved price to be paid by petitioner to Seas was $14,466,669. A sale of the vessels at that price was the only sale ever authorized by the Federal Maritime Board under the 1916 Shipping Act.

Petitioner represented to the New York Stock Exchange in an application for listing of the shares to be issued to Seas, apparently without objection by Seas, that the fair market value of the shares to be issued was $30 per share. In its annual report to shareholders for 1957,

audited by a nationally known firm of accountants, the purchase of the ships from Seas was reflected in such a way on both the assets and the stockholders' equity sections of the balance sheet as to indicate that the stock issued pursuant thereto was issued at a value of $30 per share. In a note to its 1957 financial statements petitioner represented to its shareholders that the aggregate purchase price of the 10 ships was $14,467,000, a figure which assumes a value of $30 per share for the stock issued. In the letter from petitioner to Seas in which petitioner exercised its option to exclude the *Doncaster* and the *Kettering* from the contract petitioner referred to the remaining aggregate price for all the ships in terms only of dollars—not in terms of dollars and shares—with shares apparently converted to dollars at a rate of $30 per share. Hence, it appears abundantly clear that, both in the contract itself and thereafter in dealings with third parties and with each other, both of the parties to the contract at all times regarded the 300,000 shares of stock as worth $30 per share.

In finding as an ultimate fact that the 300,000 shares of petitioner's stock issued to Seas in 1957 in exchange for ships of the Robin Line were worth $30 per share, we have carefully examined and weighed all of the evidence submitted by both parties. We have done our best to give to each bit of evidence the weight to which it is entitled in using our best judgment to find fair market value. Based upon all of the evidence before us thus considered and applying our reasoned finding of fair market value to the issue before us, we hold that the cost basis to petitioner of the SS *Robin Tuxford* was $1,266,690, and the cost basis to petitioner of the SS *Robin Wentley* was $1,266,678.[3]

The second issue in this case involves the question of the proper cost basis upon which petitioner is entitled to compute a depreciation deduction for certain ships acquired under a 1941 contract in a transaction subject to the Merchant Ship Sales Act of 1946. In its Federal income tax return for the year 1957 petitioner took depreciation on these vessels on the assumption that their cost basis was not the statutory sales price, $5,522,376, but rather $6,701,340.31, the difference between $8,284,330.24, the original sales price, and $1,582,989.93, the net 1946 sales price adjustment credited to petitioner.

Petitioner's argument, quite simply, is that during the war it paid $8,284,330.24 for the ships. Pursuant to the adjustment under the 1946 Act, petitioner asserts it was paid back $1,582,989.93. Thus, petitioner concludes that its cost and therefore its depreciation basis for tax purposes in these ships is the difference between these two figures or $6,701,340.31. The respondent agrees that petitioner paid $8,284,330.24 during the war and received back $1,582,989.93 under the

---

[3] The slight dollar discrepancy is not explained by the record which as our findings indicate showed payment of 42,223 shares of stock for *Tuxford* and 28,667 shares of stock, plus $406,668 in cash for *Wentley*.

Act. Respondent points out, however, that if the net credit to the Government under the unwinding provisions of the Act ($1,178,964.31), which represents the net refund to the Government for charter hire paid during the war, were to be added to the statutory sales price in order to compute tax basis, this would defeat an essential purpose of the Act to put all wartime purchasers on the same footing as post-Act purchasers. Thus, the basis for post-Act purchasers would be the statutory sales price; the basis to pre-Act purchasers after adjustment would be statutory sales price *plus* the net credit to the Government for refund of charter hire. Pre-Act purchasers would have the advantage of higher bases and consequent larger depreciation deductions. Respondent also argues that the unwinding adjustments under the Act are not capital items; they are explicit earnings adjustments, and that such earnings adjustments cannot enter into the computation of basis for depreciation.

This issue, involving certain income tax effects of section 9 of the Merchant Ship Sales Act, is not a novel one. Several courts have tackled the problem here presented, with an unfortunate lack of unanimity in their results. At least two District Courts and the Court of Claims have held for the taxpayer: *Waterman Steamship Corporation* v. *United States*, 203 F. Supp. 915 (D. Ala. 1962), rev. 330 F. 2d 128 (C.A. 5, 1964); *Socony Mobil Oil Co.* v. *United States*, 287 F. 2d 910 (Ct. Cl. 1961); *Barber Oil Corporation* v. *Manning*, 135 F. Supp. 451 (D. N.J. 1955). At least two circuit courts and one District Court have held for the Government: *National Bulk Carriers, Inc.* v. *United States*, 214 F. Supp. 585 (D. Del. 1963), affd. 331 F. 2d 407 (C.A. 3, 1964); *Waterman Steamship Corporation* v. *United States*, 330 F. 2d 128 (C.A. 5, 1964), reversing 203 F. Supp. 915 (D. Ala. 1962).

It was not without some relief that this Court learned that the tempest in the courts surrounding the Merchant Ship Sales Act of 1946 which has caused choppy seas for the ships of many taxpayers subsided just as it began to pound our own shores in the instant case. The conflict in the above-cited cases was resolved on May 17, 1965, subsequent to the trial and filing of briefs in the instant case when the Supreme Court handed down its decision in *Waterman Steamship Corporation* v. *United States*, 381 U.S. 252 (1965), affirming 330 F. 2d 128 (C.A. 5, 1964).

The second issue in the instant case is identical to the issue presented to the Supreme Court in *Waterman*, and, therefore, we deem that case to be controlling on our decision here. The Supreme Court held that the proper basis for depreciation on ships subject to section 9 of the Merchant Ship Sales Act of 1946, is the statutory sales price under that Act. Nothing further would be accomplished by our discussing the arguments of the parties in the instant case or the reasons why the Supreme Court reached the result it did in *Waterman*. Justice Gold-

berg's very clear exposition of the arguments on both sides and his thorough examination of the statutory history of the Merchant Ship Sales Act of 1946 require no further elaboration from us.

We hold, accordingly, that the basis of the six vessels purchased in 1941 whose prices were readjusted pursuant to section 9 of the Merchant Ship Sales Act of 1946 is their statutory sales price of $5,522,376. *Waterman Steamship Corporation* v. *United States, supra.*

*Decision will be entered under Rule 50.*

